## STATE OF MISSOURI *v.* HOLLAND, UNITED STATES GAME WARDEN.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF MISSOURI.

No. 609. Argued March 2, 1920.—Decided April 19, 1920.

Protection of its quasi sovereign right to regulate the taking of game is a sufficient jurisdictional basis, apart from any pecuniary interest, for a bill by a State to enjoin enforcement of federal regulations over the subject alleged to be unconstitutional. P. 431.

The Treaty of August 16, 1916, 39 Stat. 1702, with Great Britain, providing for the protection, by close seasons and in other ways, of migratory birds in the United States and Canada, and binding each power to take and propose to their law-making bodies the necessary measures for carrying it out, is within the treaty-making power conferred by Art. II, § 2, of the Constitution; the Act of July 3, 1918, c. 128, 40 Stat. 755, which prohibits the killing, capturing or selling any of the migratory birds included in the terms of the treaty, except as permitted by regulations compatible with those terms to be made by the Secretary of Agriculture, is valid under Art. I, § 8, of the Constitution, as a necessary and proper means of effectuating the treaty; and the treaty and statute, by bringing such birds within the paramount protection and regulation of the Government do not infringe property rights or sovereign powers, respecting such birds, reserved to the States by the Tenth Amendment. P. 432.

With respect to rights reserved to the States, the treaty-making power is not limited to what may be done by an unaided act of Congress. P. 432.

258 Fed. Rep. 479, affirmed.

THE case is stated in the opinion.

*Mr. J. G. L. Harvey* and *Mr. John T. Gose,* Assistant Attorney General of the State of Missouri, with whom *Mr. Frank W. McAllister,* Attorney General of the State of Missouri, was on the brief, for appellant:

If the act of Congress now in question would have been unconstitutional when the Constitution and the first amendments were framed and ratified, it is unconstitutional now. The Constitution itself does not change. *South Carolina* v. *United States,* 199 U. S. 447, 448.

Under the ancient law, the feudal law, and the common law in England, the absolute control of wild game was a necessary incident of sovereignty. When, therefore, the United Colonies became "Free and Independent States" with full power to do all "acts and things which Independent States may of right do," the power to control the taking of wild game passed to the States. *Geer* v. *Connecticut,* 161 U. S. 519, 523–530; *Ward* v. *Race Horse,* 163 U. S. 504.

If it had even been suggested that, although Congress had no power to control the taking of wild game within the borders of any State, yet indirectly by means of a treaty with some foreign power it could acquire the power and by this means its long arm could reach into the States and take food from the tables of their people, who can for one moment believe that such a constitution would have been ratified? Wild game and the right of the people thereto have always been a "touchy" subject with all English speaking people. It was of sufficient importance to be a part of the *Magna Charta* and the "Charter of the Forests." See *Parker* v. *People,* 111 Illinois, 581, 647.

This power of the State over wild game within its borders, which "cannot be questioned" and "will not be gainsaid," is derived from the peculiar nature of such property and its common ownership by all the citizens of the State in their collective sovereign capacity. The State in its sovereign capacity is the representative of the people in their common ownership, and holds it in trust for the benefit of all its people. *Geer* v. *Connecticut, supra,* 529, 530; *McCready* v. *Virginia,* 94 U. S. 391; *Martin* v. *Waddell,* 16 Pet. 410; *United States* v. *Shauver,* 214 Fed. Rep. 154; *United States* v. *McCullagh,* 221 Fed. Rep. 288, 294; *Rupert* v. *United States,* 181 Fed. Rep. 87, 90; *Magner* v. *People,* 97 Illinois, 320, 333; *Gentile* v. *State,* 29 Indiana, 409, 417; *Ex parte Maier,* 103 California, 476, 483; *Chambers* v. *Church,* 14 R. I. 398, 400; *Manchester* v. *Massachusetts,* 139 U. S. 240; *Patsone* v. *Pennsylvania,* 232 U. S. 138; *Abby Dodge* v. *United States,* 223 U. S. 166; *Smith* v. *Maryland,* 18 How. 71; *Carey* v. *South Dakota,* 250 U. S. 118; *Silz* v. *Hesterberg,* 211 U. S. 31; *In re Deininger,* 108 Fed. Rep. 623; *Heim* v. *McCall,* 239 U. S. 175.

But the power of the State is not dependent upon the authority which the State derives from common ownership and the trust for the benefit of the people; it is a necessary incident of the power of police—an attribute of sovereignty. *State* v. *Heger,* 194 Missouri, 707.

If a source of food supply is not within the exclusive control of a State under its power of police, is there anything which is? If Congress by means of a treaty can tell the people of a State when and under what conditions they may take wild game which they own in their collective sovereign capacity, and in and over which, while within the borders of the State, neither Congress nor any foreign nation can have, either under national or international law (see Behring Sea Arbitration, 32 Amer. Law Reg. 901), any property rights or any power of control, then

the Tenth Amendment with its powers "reserved" to the States respectively or to the people, is a delusion, and they are States in name only, and our government a very different government from that presupposed and intended by the people who ratified the Constitution. *Passenger Cases,* 7 How. 474.

Upon the authority and principles of the cases above cited it has been held that the Act of Congress, approved March 4, 1913, was unconstitutional. The fact that the present act purports to give effect to a treaty cannot validate it. Every treaty must be presumed to be made subject to the rightful powers of the governments concerned, and neither the treaty-making power alone, nor the treaty-making power in conjunction with any or all other departments of the Government, can bind the Government to do that which the Constitution forbids. *Geofroy* v. *Riggs,* 133 U. S. 258, 267; *People* v. *Gerke,* 5 California, 381, 382 *et seq.; George* v. *Pierce,* 148 N. Y. S. 230, 237; *Compagnie* v. *Board,* 51 La. Ann. 645, 662; affd. 186 U. S. 380; *Cantini* v. *Tillman,* 54 Fed. Rep. 969; *Loan Association* v. *Topeka,* 20 Wall. 655, 662, 663; *Cherokee Tobacco Case,* 11 Wall. 616; *Siemessen* v. *Bofer,* 6 Cal. Rep. 250; *People* v. *Naglee,* 1 California, 246, 247; *Kansas* v. *Colorado,* 206 U. S. 80; *Murphy* v. *Ramsay,* 114 U. S. 15, 44; *Head Money Cases,* 112 U. S. 580; *Jones* v. *Meehan,* 175 U. S. 132; *Fong Yue Ting* v. *United States,* 149 U. S. 698; *Seneca Nation* v. *Christie,* 126 N. Y. 122; *Fort Leavenworth* v. *Lowe,* 114 U. S. 525; *Pierce* v. *State,* 13 N. H. 576; *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 326; *Mormon Church* v. *United States,* 136 U. S. 1; The Federalist, Nos. 33, 45; Works of Calhoun, vol. I, 203, 204, 249, 250, 252, 253; Tucker, Const., vol. II, 725, 726; Butler, Treaty Making Power, vol. I, 64; vol. II, 350, 352; Story, Const., § 1508; Duer, Lectures on Constitutional Jurisprudence of the United States, 2d ed., 228; Cooley, Const. Law, 117; Van Holst, Const. Law,

202; Thayer, Cases on Const. Law, vol. I, 373; Senator Rayner, 59th Cong., 41 Cong. Rec., pt. 1, 299; Cocke's Constitutional History, 235; Jefferson, Manual of Parliamentary Practice, 110, note 3; Elliot's Debates, vol. III, 504, 507; Cooley, Const. Lim., 7th ed., 11; Hamilton's Works, vol. IV, 324.

In the consideration of the questions involving the powers of the federal and state governments there exists the temptation to lodge all sovereign or governmental power in either the United States or the States. This disposition is evidenced by the erroneous statement that there exist in this country dual sovereignties. Cf. 8 Ops. Atty. Gen. 411–415. The power reserved to the people is overlooked. *Kansas* v. *Colorado*, 206 U. S. 90. The Federal Government is a government not only of enumerated powers, but it is also a government to which certain powers are denied. Powers denied are not to be implied: they are to be obtained, if at all, from, and in the manner provided by, those who originally granted the enumerated powers, but who at the same time denied other powers—the people. *Barron* v. *Baltimore*, 7 Pet. 243, 247; *Kansas* v. *Colorado, supra; United States* v. *Shauver*, 214 Fed. Rep. 154, 156; *Holden* v. *Joy*, 17 Wall. 243; *United States* v. *Rhodes*, 1 Abb. U. S. Rep. 43; Fed. Cases, 16151; *Fairbank* v. *United States*, 181 U. S. 283, 288; Tucker, Const., vol. I, 371–373.

Among the powers so denied are those over purely internal affairs which "concern the lives, liberties and properties of the people and the internal order, improvement and prosperity of the State," including, as held without exception, the control over wild game. When the power of the States over their purely internal affairs is destroyed, the system of government devised by the Constitution is destroyed.

If these reserved powers could be taken over through the device of treaty making, the President and Senate could

control the laws of a State relating to inspection, quarantine, health and internal trade; prescribe the times and modes of elections; force the introduction and sale of opium, intoxicating liquors or other substances, however injurious to the health and well-being of a State; cede to a foreign power a State or any part of its territory, and destroy the securities of liberty and property as effectually as the most despotic government ever formed.

But this is not all. If the treaty-making power is not within the constitutional limitations relating to the powers reserved to the States, it is not limited by any restriction of the Constitution. The Federal Government itself, as well as the several States, would be at the mercy of the President and the Senate. They could regulate foreign commerce in spite of the fact that Congress is expressly authorized to control it. They could provide for duty rates upon articles imported from foreign nations, or admit them free of duty, although Congress has express authority to lay and collect taxes and duties. They could appropriate directly from the public treasury the public moneys in the face of the express power of Congress to originate all such appropriations. They could dispose of any part of the territory of the United States, or any of their property, without the consent of Congress, which alone has power to dispose of and make rules and regulations for the property of the United States. In short, the Federal Government would be a government of men, and not of laws. The question is not whether or not they will do these things but whether or not, under our form of government, they have the power.

If a treaty be "the supreme law of the land," it has become so by construction, for the Constitution as ratified by the people made the supreme law of the land to consist of three things: (1) The Constitution; (2) the laws of the United States which shall be made in pursuance thereof; (3) all treaties made or which shall be made

under the authority of the United States. The powers reserved to the States respectively or to the people are, under this Constitution, as sacred as the power to make treaties. Are they not even more so since they are the object of specific reservation and necessarily limit or restrict the general grant of power made to the treaty-making department of the government? Hamilton's Works, vol. IV, 342; Cooley, The Forum, June, 1893, p. 397; Von Holst, Const. Law of United States, 202; Duer, Lectures on Constitutional Jurisprudence of the United States, 2d ed., 228; Tucker, Lim. Treaty-Making Power, 128, 129, 135–136, 139, 93–94, 86–87; Judge Shackleford Miller, quoted in Tucker, Lim. Treaty-Making Power, 21, 22.

The United States existed under the Articles of Confederation and the purpose was to include treaties made under that authority as well as those which should be made under the Constitution. The "authority of the United States" under the Articles of Confederation and under the Constitution was an authority derived from enumerated powers accompanied by specific reservations, and under both the Articles of Confederation and the Constitution certain rights of the States respectively and the people were jealously guarded by express exceptions. There was and could be no "authority of the United States" outside of and beyond that given by the Articles of Confederation and the Constitution.

That a treaty stands upon an equal footing with a law of the United States is settled. *Cherokee Tobacco Case,* 11 Wall. 616; *Ward* v. *Race Horse,* 163 U. S. 504.

The term "treaty" must undoubtedly be given a broad meaning, and generally speaking, it may be said that by this clause there is conferred the power to make treaties on those matters ordinarily the subject of treaties between sovereign powers. But, in the very nature of things, there must be a limit, else that power would de—

stroy many of the other provisions of the Constitution. Such meaning must be given each part of the Constitution as will not interfere with the meaning of the other parts, in order that effect may be given to the whole.

The cases usually cited by those who advocate the supremacy of a treaty do not in any instance hold that the reserved powers of a State or a trust which the State holds for the benefit of all its people are subject to and may be annulled by a treaty having for its subject the regulation of a matter which is reserved to the States respectively or to the people by the Tenth Amendment. *Ware* v. *Hylton,* 3 Dall. 199; *Chirac* v. *Chirac,* 2 Wheat. 259; *Geofroy* v. *Riggs,* 133 U. S. 266 (cf. *Fox* v. *United States,* 94 U. S. 320); *Orr* v. *Hodgson,* 4 Wheat. 453; *Fairfax* v. *Hunter,* 7 Cranch, 603; *People* v. *Gerke,* 5 California, 381, 384 (cf. Tucker, Address before Georgia Bar Association, June 2, 1917, p. 23; Lim. on Treaty-Making Power, c. 6, pp. 143 *et seq.*); *Hauenstein* v. *Lynham,* 100 U. S. 483; 22 Ops. Atty. Gen. 215.

In the making of the Constitution a negative, in any form, upon laws passed by the States in the exercise of their reserved powers was defeated, though persistently urged, in some form, by some of the ablest men in the Constitutional Convention. It was universally admitted that under the Constitution as it stood the Federal Government had no such power, and by the first ten amendments the people undertook to forestall any attempt on the part of the Federal Government to obtain such power by construction. Works of Calhoun, 246, 247, 249, 250.

Treaties are not to be given a sanctity which shields them from inspection and rejection, if, by their terms they do that which the Constitution forbids, and destroy essential rights of the States or the people. *Downes* v. *Bidwell,* 182 U. S. 244, 344; *Compagnie* v. *Board,* 186 U. S. 380, 395; *Heim* v. *McCall,* 239 U. S. 175, 194.

The High Contracting Powers must be held to have

known that the power of the Federal Government did not
extend to the taking over of a trust exercised by the State
in relation of the common property of its citizens, or the
enactment of mere police regulations within the limits of a
State; and the language of Article VIII seems to indicate
that they both had acted upon this knowledge. Such
construction leaves both the treaty and the laws of Mis-
souri intact. It results in holding unconstitutional only
an act of Congress which was not necessarily required by
the treaty, and which, under the Constitution, Congress
had no power to pass.

*The Solicitor General* and *Mr. Assistant Attorney General
Frierson* for appellee:

A migratory bird law of this kind is sustained, apart
from treaty, by the power to dispose of and make all need-
ful rules and regulations respecting the property belonging
to the United States (Art. IV, § 3), and by the power to
regulate commerce between the States.

The Constitution expressly grants to Congress the power
to enact such laws as may be necessary to give effect to
treaties. Art. I, § 8; *Baldwin* v. *Franks*, 120 U. S. 678;
*United States* v. *Jin Fuey Moy*, 241 U. S. 394; *Chinese
Exclusion Case*, 130 U. S. 581.

Whenever a treaty operates of itself, it is to be regarded
in the courts as equivalent to an act of Congress. But if
it is only promissory, it is then clearly within the province
of Congress to enact legislation necessary to put it into
effect. *Foster* v. *Neilson*, 2 Pet. 253, 314; *United States* v.
*43 Gallons of Whiskey*, 93 U. S. 188, 196.

The power of Congress to legislate to make treaties
effective is not limited to the subjects with respect to
which it is empowered to legislate in purely domestic
affairs.

There are many national questions affecting alone this
Government or the people of the United States with which

it deals: With respect to this class the line of demarcation between the powers of the state governments and those of the Federal Government is clearly marked by the Constitution. But when we come to deal with national questions affecting the interests of other countries as well as our own, we confront a different situation. At home, we are citizens of dual sovereignties, each supreme within its own sphere. But, in our intercourse with foreign nations, we are one people and one nation. In our relations to foreign countries and their subjects or citizens, our Federal Government is one Government and is invested with the powers which belong to independent nations and which the several States would possess, if separate nations, and the exercise of these powers can be invoked for the maintenance of independence and security throughout the entire country. *Cohens* v. *Virginia*, 6 Wheat. 264, 413; *Knox* v. *Lee*, 12 Wall. 457, 555; *Chinese Exclusion Case*, 130 U. S. 581, 604.

In exercising the treaty-making power, the Federal Government acts for the entire American people, whether we regard them as citizens of the United States or as citizens of the several States, and likewise for every State. As said by this court in *Hauenstein* v. *Lynham*, 100 U. S. 483, 490: "If the National Government has not the power to do what is done by such treaties, it cannot be done at all, for the States are expressly forbidden to 'enter into any treaty, alliance, or confederation.'"

Since the power was expressly granted to Congress to enact legislation necessary and proper to put into execution a treaty, the validity of such legislation cannot depend upon whether its subject-matter is included within the general legislative powers of Congress. Rather, it depends upon whether the treaty which is being enforced is within the treaty-making power of the United States. *In re Ross*, 140 U. S. 453, 463.

By the Constitution the complete and unrestricted

.treaty-making power possessed by the States is expressly
granted to the United States to be exercised by the President
and Senate. The exercise of such power is expressly
prohibited to the States. Therefore, except as restrained
by prohibitions contained in other clauses of the Constitution,
the entire treaty-making power of the States was
vested in the United States when that instrument was
adopted in 1788.

Amendment X (thereafter adopted) reserves to the
States or the people all powers not granted to the United
States nor prohibited to the States. As the treaty powers
had been both granted to the United States and prohibited
to the States, they were expressly excepted from
the reservations of the Tenth Amendment, and it is wholly
irrelevant. A treaty made by the treaty-making power
does not derogate from the power of any State. It is an
exercise of the treaty-making power of such State in conjunction
with the like powers of all of the States by their
common government—the agency they appointed in
adopting the Constitution.

It is undoubtedly true that, generally, matters of a
purely local nature are reserved for the legislative power
of the States. But just what these reserved powers are
depends upon the extent to which powers, either expressly
or by necessary implication, are conferred upon the Federal
Government. The police powers are those most generally
regarded as having been reserved to the States.
But, if the full exertion of any power conferred upon the
Federal Government requires the exercise of police powers
within the States, such powers may be exercised to the
extent necessary, although they may involve an interference
with what would otherwise lie exclusively within
the province of the State. *United States* v. *Thompson*,
258 Fed. Rep. 257, 264. That the police or other powers
of the States cannot be interposed as an obstacle to the
exertion of these federal powers to make and enforce

treaties has been too often decided to now admit of doubt. *Wildenhus's Case,* 120 U. S. 1, 17; *Ware* v. *Hylton,* 3 Dall. 199; *Chirac* v. *Chirac,* 2 Wheat. 259, 276; *Geofroy* v. *Riggs,* 133 U. S. 258, 266; *Hopkirk* v. *Bell,* 3 Cranch, 454; *United States* v. *43 Gallons of Whiskey,* 93 U. S. 188; *United States* v. *Winans,* 198 U. S. 371.

It is inconceivable that, since the States were to be denied the treaty-making power, the framers of the Constitution intended that the treaty-making power conferred upon the new Government should be less than that possessed by any other independent government and less than that possessed by the State conferring it. The very general language used in conferring the power negatives such an intention. What was conferred was obviously that power to negotiate treaties which is essential if there is to be intercourse between nations.

Again, those representing the States in the Constitutional Convention understood too well the necessity for the exercise of such a power to have been willing to deprive the States of the ample power that they had unless, at least, as full power was to be vested in some other agency.

It must be remembered that every power which was conferred upon the Federal Government was taken from those powers which the State had the right to exercise, and it would seem impossible to construe the two provisions of the Constitution, above referred to, as accomplishing anything short of the transfer of all the treaty-making power which the several States had to the new Federal Government. *Baldwin* v. *Franks,* 120 U. S. 678, 682, 683.

Before the adoption of the Constitution it cannot be doubted that each State could not only enact such laws as it deemed necessary for the protection of game within its borders, but could, likewise, enter into a treaty with any other State or foreign country for the protection of

migratory game which remained within its borders only a portion of the year. After the adoption of the Constitution, however, as said in *Geer* v. *Connecticut,* 161 U. S. 519, 528, this power remained in the States only "in so far as its exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal Government by the Constitution." But if the protection of migratory game is a proper subject-matter for treaties between independent nations, the power to secure this protection was expressly conferred upon the Federal Government as a part of the treaty-making power.

The peculiar nature of its property in migratory game, which is in one country during a part of the year and in another during the remainder of the year, makes it impossible for the laws of one State or one country to give ample protection. This can be accomplished only by concert of action on the part of two or more States or countries. This, in the very nature of things, cannot be secured except through the medium of treaties.

The treaty-making power applies to all matters which may properly be the subject of negotiations between the two governments. Calhoun, 4 Elliot's Debates, 464; Story, Const., 5th ed., § 1508; *Ware* v. *Hylton,* 3 Dall. 199, 235; *Geofroy* v. *Riggs,* 133 U. S. 258, 266; *In re Ross,* 140 U. S. 453, 463.

The protection of migratory game is a proper subject of negotiations and treaties between the governments of the countries interested in such game. Van Valkenburgh, J., in the court below, 258 Fed. Rep. 479, 484; *United States* v. *Rockefeller,* 260 Fed. Rep. 346–348.

It may be that, while migratory birds are within a State, that State, as trustee for its people, has the same title to them that it has to birds which remain permanently within its borders. But, when the birds return to Canada, that government has exactly the same title that the State has when they are in the United States. More-

over, while the birds are in Canada, the State to which they customarily migrate is still interested in them, because, when they return, its title again attaches. Manifestly, then, the States of the United States are as much interested in the preservation of these birds while in Canada as while in the United States. But for the protection of these migratory birds while they are in a foreign country, each State is powerless. While in the one case, therefore, it resorts to its own legislative power, in the other it must have resort to an exercise of power by the agent which it has agreed shall act for it in negotiating and making treaties with foreign governments.

*Mr. Richard J. Hopkins,* Attorney General of the State of Kansas, and *Mr. Samuel W. Moore,* by leave of court, filed a brief as *amici curiæ,* in behalf of the State of Kansas:

Every State possesses the absolute right to deal as it may see fit with property held by it either as proprietor or in its sovereign capacity as a representative of the people, and this right is paramount to the federal legislative or treaty-making power.

The constitutional limitation prohibiting a State without the consent of Congress from entering into any agreement or compact with any State or with a foreign power prohibits "the formation of any combination tending to the increase of political power in the States which may encroach upon or interfere with the just supremacy of the United States." It has no application to agreements or compacts which a State may make in the control and regulation of its own property or property rights.

Congress' lack of legislative power to divest a State of its property right and control over the wild game within its borders cannot be supplied by making a treaty with Great Britain.

The treaty-making power of the National Government

is so limited by other provisions of the Constitution, including the Tenth Amendment, that it cannot divest a State of its police power or of its ownership or control of its wild game.

The courts have never upheld a treaty whose subject-matter extended beyond the constitutional domain of congressional legislation.

The treaty in this case does not, by its terms, purport to create a closed season between December 31st and March 10th. Its executory agreement to pass future legislation covering this period is not the supreme law of the land and cannot have the effect of giving validity to an unconstitutional act.

*Mr. Louis Marshall,* by leave of court, filed a brief as *amicus curiæ,* in behalf of the Association for the Protection of the Adirondacks:

Irrespective of whether migratory birds may be considered property belonging to the United States and regardless of the sanction of the treaty-making power, the Migratory Bird Treaty Act, as was its precursor the Act of March 4, 1913, c. 145, 37 Stat. 847, is valid as an enactment of "needful rules and regulations" respecting the national forests and other parts of the public domain, which constitute "property belonging to the United States," within the meaning of paragraph 2, § 3 of Article IV of the Constitution.

The fact that the States are trustees of animals *feræ naturæ* within their boundaries, does not prevent the United States from preserving such animals for the purpose of protecting its property.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a bill in equity brought by the State of Missouri to prevent a game warden of the United States from attempting to enforce the Migratory Bird Treaty Act of

July 3, 1918, c. 128, 40 Stat. 755, and the regulations made by the Secretary of Agriculture in pursuance of the same.' The ground of the bill is that the statute is an unconstitutional interference with the rights reserved to the States by the Tenth Amendment, and that the acts · of the defendant done and threatened under that authority invade the sovereign right of the State and contravene its will manifested in statutes. The State also alleges a pecuniary interest, as owner of the wild birds within its borders and otherwise, admitted by the Government to be sufficient, but it is enough that the bill is a reasonable and proper means to, assert the alleged quasi sovereign rights of a State. *Kansas* v. *Colorado*, 185 U. S. 125, 142. *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230, 237. *Marshall Dental Manufacturing Co.* v. *Iowa*, 226 U. S. 460, 462. A motion to dismiss was sustained by the District Court on the ground that the act .of Congress is constitutional. 258 Fed. Rep. 479. Acc. *United States* v. *Thompson*, 258 Fed. Rep. 257; *United States* v̇. *Rockefeller*, 260 Fed. Rep. 346. The State appeals.

On December 8, 1916, a treaty between the United States and Great Britain was proclaimed by the President. It recited that many species of birds in their annual migrations traversed certain parts of the United States and of Canada, that they were of great value as a source of food and in destroying insects injurious to vegetation, but were in danger of extermination through lack of adequate protection. It therefore provided for specified close seasons and protection in other forms, and agreed that the two powers would take or propose to their law-making bodies the necessary measures for carrying the treaty out. 39 Stat. 1702. The above mentioned Act of July 3, 1918, entitled an act to give effect to the. convention, prohibited the killing, capturing or selling any of the migratory birds included in the terms of the treaty except as permitted by regulations compatible with those terms, to be made by

the Secretary of Agriculture. Regulations were proclaimed on July 31, and October 25, 1918. 40 Stat. 1812; 1863. It is unnecessary to go into any details, because, as we have said, the question raised is the general one whether the treaty and statute are void as an interference with the rights reserved to the States.

To answer this question it is not enough to refer to the Tenth Amendment, reserving the powers not delegated to the United States, because by Article II, § 2, the power to make treaties is delegated expressly, and by Article VI treaties made under the authority of the United States, along with the Constitution and laws of the United States made in pursuance thereof, are declared the supreme law of the land. If the treaty is valid there can be nò dispute about the validity of the statute under Article I, § 8, as a necessary and proper means to execute the powers of the Government. The language of the Constitution as to the supremacy of treaties being general, the question before us is narrowed to an inquiry into the ground upon which the present supposed exception is placed.

It is said that a treaty cannot be valid if it infringes the Constitution, that there are limits, therefore, to the treaty-making power, and that one such limit is that what an act of Congress could not do unaided, in derogation of the powers reserved to the States, a treaty cannot do. An earlier act of Congress that attempted by itself and not in pursuance of a treaty to regulate the killing of migratory birds within the States had been held bad in the District Court. *United States* v. *Shauver*, 214 Fed. Rep. 154. *United States* v. *McCullagh*, 221 Fed. Rep. 288. Those decisions were supported by arguments that migratory birds were owned by the States in their sovereign capacity for the benefit of their people, and that under cases like *Geer* v. *Connecticut*, 161 U. S. 519, this control was one that Congress had no power to displace. The same argument is supposed to apply now with equal force.

Whether the two cases cited were decided rightly or not they cannot be accepted as a test of the treaty power. Acts of Congress are the supreme law of the land only when made in pursuance of the Constitution, while treaties are declared to be so when made under the authority of the United States. It is open to question whether the authority of the United States means more than the formal acts prescribed to make the convention. We do not mean to imply that there are no qualifications to the treaty-making power; but they must be ascertained in a different way. It is obvious that there may be matters of the sharpest exigency for the national well being that an act of Congress could not deal with but that a treaty followed by such an act could, and it is not lightly to be assumed that, in matters requiring national action, "a power which must belong to and somewhere reside in every civilized government" is not to be found. *Andrews v. Andrews,* 188 U. S. 14, 33. What was said in that case with regard to the powers of the States applies with equal force to the powers of the nation in cases where the States individually are incompetent to act. We are not yet discussing the particular case before us but only are considering the validity of the test proposed. With regard to that we may add that when we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters. It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation. The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago. The treaty in question does not contravene any prohibitory words to be found in the Constitution. The only question is whether

it is forbidden by some invisible radiation from the general terms of the Tenth Amendment. We must consider what this country has become in deciding what that Amendment has reserved.

The State as we have intimated founds its claim of exclusive authority upon an assertion of title to migratory birds, an assertion that is embodied in statute. No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of such birds, but it does not follow that its authority is exclusive of paramount powers. To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership. The whole foundation of the State's rights is the presence within their jurisdiction of birds that yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away. If we are to be accurate we cannot put the case of the State upon higher ground than that the treaty deals with creatures that for the moment are within the state borders, that it must be carried out by officers of the United States within the same territory, and that but for the treaty the State would be free to regulate this subject itself.

As most of the laws of the United States are carried out within the States and as many of them deal with matters which in the silence of such laws the State might regulate, such general grounds are not enough to support Missouri's claim. Valid treaties of course "are as binding within the territorial limits of the States as they are elsewhere throughout the dominion of the United States." *Baldwin* v. *Franks*, 120 U. S. 678, 683. No doubt the great body of private relations usually fall within the control of the State, but a treaty may override its power. We do not have to invoke the later developments of constitutional law for this proposition; it was recognized as early as *Hopkirk* v. *Bell*, 3 Cranch, 454, with regard to statutes

of limitation, and even earlier, as to confiscation, in *Ware v. Hylton*, 3 Dall. 199. It was assumed by Chief Justice Marshall with regard to the escheat of land to the State in *Chirac v. Chirac*, 2 Wheat. 259, 275. *Hauenstein v. Lynham*, 100 U. S. 483. *Geofroy v. Riggs*, 133 U. S. 258. *Blythe v. Hinckley*, 180 U. S. 333, 340. So as to a limited jurisdiction of foreign consuls within a State. *Wildenhus's Case*, 120 U. S. 1. See *Ross v. McIntyre*, 140 U. S. 453. Further illustration seems unnecessary, and it only remains to consider the application of established rules to the present case.

Here a national interest of very nearly the first magnitude is involved. It can be protected only by national action in concert with that of another power. The subject-matter is only transitorily within the State and has no permanent habitat therein. But for the treaty and the statute there soon might be no birds for any powers to deal with. We see nothing in the Constitution that compels the Government to sit by while a food supply is cut off and the protectors of our forests and our crops are destroyed. It is not sufficient to rely upon the States. The reliance is vain, and were it otherwise, the question is whether the United States is forbidden to act. We are of opinion that the treaty and statute must be upheld. *Carey v. South Dakota*, 250 U. S. 118.

*Decree affirmed.*

MR. JUSTICE VAN DEVANTER and MR. JUSTICE PITNEY dissent.