**UNITED STATES of America, Plaintiff,**

v.

**Jerome P. BAIR, James L. Anderson, and Gordon Lee Harms, Defendants.**

**Crim. No. 78–L–31.**

United States District Court,
D. Nebraska.

Feb. 14, 1979.

Thomas D. Thalken, Asst. U. S. Atty., Omaha, Neb., for United States.

John F. Recknor, Lincoln, Neb., for defendants.

MEMORANDUM AND ORDER

URBOM, Chief Judge.

The defendants have been charged with violations of 16 U.S.C. § 742j–1 and the aiding and abetting provision, 18 U.S.C. § 2. Section 742j–1 prohibits, with certain exceptions, hunting from aircraft and provides for a penalty of up to $5,000 or imprisonment for not more than one year. The information claims that on two occasions the defendants used a helicopter "for the purpose of shooting, capturing and killing . . . [coyotes]." The defendants have filed motions to dismiss, claiming that § 742j–1 is unconstitutional because Congress had no authority to regulate fish and wildlife on lands within the boundaries of the various states.

The defendants rely primarily on a recent case from the United States District Court for the District of Montana which held the statute to be unconstitutional. *United States v. Helsey*, 463 F.Supp. 1111 (D.C. Mont.1979). That court held that the Tenth Amendment to the United States Constitution[1] reserved to the states or the people those rights not specifically delegated to the federal government and read *Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896), to mean that the right to control fish and wildlife is one such reserved power.

In *Geer v. Connecticut*, supra, the defendant had been charged with violating a state regulation which prohibited the possession

---

1. "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

of game for the purpose of transporting it to another state. The decision dealt chiefly with the rights over game of individuals vis-a-vis the state. The court concluded:

". . . 'In the first place then, we have already shown, and indeed it cannot be denied, that by the law of nature every man from the prince to the peasant has an equal right of pursuing and taking to his own use all such creatures as are *feroe naturoe*, and, therefore, the property of nobody, but liable to be seized by the first occupant, and so it was held by the imperial law even so late as Justinian's time. . . . But it follows from the very end and constitution of society that this natural right as well as many others belonging to a man as an individual may be restrained by positive laws enacted for reasons of state or for the supposed benefit of the community.' 2 Bl.Com. 410.

"The practice of the government of England from the earliest time to the present has put into execution the authority to control and regulate the taking of game. "Undoubtedly this attribute of government to control the taking of animals *feroe naturoe*, which was thus recognized and enforced by the common law of England, was vested in the colonial governments, where not denied by their charters, or in conflict with grants of the royal prerogative. It is also certain that the power which the colonies thus possessed passed to the States with the separation from the mother country, and remains in them at the present day, in so far as its exercise may be not incompatible with, or restrained by, the rights conveyed to the Federal government by the Constitution. . . ."

161 U.S. at 527–528, 16 S.Ct. at 603–604.

The plaintiff in error had argued that the game, when disposed of, became a part of interstate commerce and thus was subject to regulation under the commerce clause. The Supreme Court rejected the argument:

"The fact that internal commerce may be distinct from interstate commerce, destroys the whole theory upon which the argument of the plaintiff in error proceeds. The power of the State to control the killing of and ownership in game being admitted, the commerce in game, which the state law permitted, was necessarily only internal commerce, since the restriction that it should not become the subject of external commerce went along with the grant and was a part of it. All ownership in game killed within the State came under this condition, which the State had the lawful authority to impose, and no contracts made in relation to such property were exempt from the law of the State consenting that such contracts be made, provided only they were confined to internal and did not extend to external commerce."

161 U.S. at 532, 16 S.Ct. at 605.

The rationale of the *Geer* case has been substantially eroded both in its reliance on title to wildlife and, perhaps, by commerce clause cases since the 1930s. In *Missouri v. Holland*, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920), it was held that Congress, in exercising its treaty power, could enact laws concerning migratory birds. While not specifically citing *Geer*, the *Missouri* court noted:

"The State as we have intimated founds its claim of exclusive authority upon an assertion of title to migratory birds, an assertion that is embodied in statute. No doubt it is true that as between a State and its inhabitants the State may regulate the killing and sale of such birds, but it does not follow that its authority is exclusive of paramount powers. To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership. The whole foundation of the State's rights is the presence within their jurisdiction of birds that yesterday had not arrived, tomorrow may be in another State and in a week a thousand miles away. If we are to be accurate we cannot put the case of the State upon higher ground than that the treaty deals with creatures that for the moment are within the state borders;

that it must be carried out by officers of the United States within the same territory, and that but for the treaty the State would be free to regulate this subject itself."

252 U.S. at 434, 40 S.Ct. at 384.

See, also, *Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977). This is not to deny that the states have "retained interests . . . of substantial legal moment" in the control of fish and game, but state regulations will fail when they come into direct conflict with permissible federal legislation. *Douglas v. Seacoast Products, Inc.*, supra, at 288, 97 S.Ct. at 1753 (Rehnquist, J., concurring and dissenting).

I am not concerned here with the right of states to pass laws affecting the practice of shooting animals and birds from aircraft. Rather, the issue is whether the United States Congress may do so. Cases since *Geer* undeniably establish that Congress may promulgate laws affecting animals when acting pursuant to one of the powers granted Congress by the federal constitution. Thus, Congress may, pursuant to its treaty power, regulate the killing, capturing, and selling of specified migratory birds. *Missouri v. Holland*, supra. In regulating interstate commerce, it may require cattle, which range across state lines, to be treated for certain diseases. *Thornton v. United States*, 271 U.S. 414, 46 S.Ct. 585, 70 L.Ed. 1013 (1926); see, also, *Cerritos Gun Club v. Hall*, 96 F.2d 620 (9th Cir. 1938), and *Cochrane v. United States*, 92 F.2d 623 (7th Cir. 1937). Also, Congress may act, under the property clause, to protect wild, free-roaming horses and burros on public lands of the United States. *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

The government does not seek to justify the legislation under the property clause; it does believe authority can be found in the treaty power and the power to control interstate commerce. Because I believe the Act can be upheld on the basis of the commerce clause, I do not address the issue of the treaty power.[2]

Few cases can be found since the 1940s in which a court has found that Congress exceeded its authority while acting pursuant to the commerce clause. Nevertheless, there are limits to that authority, as the Supreme Court made clear in *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). There, the Supreme Court proclaimed that the Tenth Amendment, far from being the "truism" described in *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), foreclosed Congress from placing minimum wage and maximum hour restrictions on states as employers. I think, however, that this statute can be supported as a valid exercise of the commerce power.

In *United States v. Synnes*, 438 F.2d 764 (8th Cir. 1971), the United States Court of Appeals for the Eighth Circuit faced a constitutional challenge to a statute which subjected to criminal penalties any felon "who receives, possesses, or transports in commerce or affecting commerce" a firearm. 438 F.2d at 766. The court stated:

> "The Commerce Clause of the Constitution, Art. I, § 8, cl. 3, combined with the Necessary and Proper Clause, Art. I, § 8, cl. 18, gives to Congress the power to regulate both interstate commerce and any intrastate activity which '* * * exerts a substantial economic effect on interstate commerce * * *.' *Wickard v. Filburn*, 317 U.S. 111, 125, 63 S.Ct. 82,

---

2. The government cites the court to two treaties: (1) The Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere signed by representatives of the United States and numerous Central American and South American countries in 1940, 56 Stat. 1354, t.s. 981; and (2) the Convention Between the United States of America and the United Mexican States for the Protection of Migratory Birds and Game Mammals, signed in 1936, 50

Stat. 1311, t.s. 912. I found no indication in either the House or Senate reports, or in the hearings conducted before the Subcommittee on Fisheries and Wildlife Conservation of the Committee on Merchant Marine and Fisheries of the House of Representatives that this legislation was intended to be an implementation of those treaties, a fact which may distinguish the instant case from *Missouri v. Holland*, supra.

89, 87 L.Ed. 122 (1942). See also, *Katzenback v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed. 290 (1964); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). As Justice Black stated in his concurring opinion in *Heart of Atlanta Motel*:

> '* * * [T]his Court has steadfastly followed, and indeed has emphasized time and time again, that Congress has ample power to protect interstate commerce from activities adversely and injuriously affecting it, *which but for this adverse effect on interstate commerce would be beyond the power of Congress to regulate.*' 379 U.S. at 272, 85 S.Ct. at 365 (Emphasis added.).

"In determining whether the legislation in question is within the limits set out above, we examine: (1) whether Congress had a rational basis for finding that receipt or possession of a firearm by a convicted felon affects commerce, and (2) if it had such a basis, whether the means it selected to protect commerce are reasonable and appropriate. See, *Heart of Atlanta Motel, Inc. v. United States, supra* at 258–259, 85 S.Ct. 348 [at 358]; *White v. United States*, 399 F.2d 813, 823 (8th Cir. 1968)."

438 F.2d at 767.

The court looked at the scant legislative history available. One report contained therein estimated the economic cost of homicide, robbery, burglary, larceny and auto theft. From these figures alone, the court concluded that "[w]ithout question, these appalling costs substantially burden interstate commerce." 438 F.2d at 768. The same report indicated that felons often repeat their crimes. Other portions of the legislative history indicated that crime is made more likely with the existence of a gun or knife. *Id.* Based upon this information and its interpretation, the court concluded:

> "While these data may not be as precise or particular as might be desired, we find it impossible to say that Congress had no rational basis for finding that receipt or possession of a firearm by a convicted felon affects commerce.

> "Having found a rational nexus between the regulated activity and interstate commerce, we cannot say that the proscriptions of § 1202(a)(1) are unreasonable or inappropriate means for eliminating the evil perceived by Congress. Again, our viewpoint must be relative rather than absolute; the exercise of congressional power need not coincide with what we believe to be the optimum choice of available alternatives. It need only be reasonable and appropriate. *Heart of Atlanta Motel, Inc. v. United States, supra; United States v. Perez*, 426 F.2d 1073 (2nd Cir.), cert. granted, 400 U.S. 915, 91 S.Ct. 175, 27 L.Ed.2d 154 (1970). Therefore, while licensing or registration systems or a more limited prohibition may also pass constitutional muster, we find it both reasonable and appropriate for Congress to prohibit convicted felons from possessing or receiving firearms."

438 F.2d at 768.

The decision in *Synnes* was vacated on other grounds in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). The Eighth Circuit reaffirmed its finding with respect to the nexus between the evil sought to be prevented and interstate commerce in *United States v. Burton*, 475 F.2d 469 (8th Cir. 1973), cert. denied, 414 U.S. 835, 94 S.Ct. 178, 38 L.Ed.2d 70:

> ". . . We have held heretofore that the Congress had a rational basis for finding that the receipt, possession or transportation of a firearm by felons affected commerce. *United States v. Synnes*, 438 F.2d 764 (8th Cir. 1971), vacated on other grounds; *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). See, also *Cody v. United States*, 460 F.2d 34 (8th Cir. 1972). . . ."

475 F.2d at 471.

Using an analysis similar to that employed in *Synnes*, I conclude that the instant statute is valid. Senate Report No. 92–421, 92d Cong., 1st Sess. (1971), reprinted in 1971 U.S.Code Cong. & Admin.News, p. 1735, includes the following statement:

"Section 609 of the Federal Aviation Act of 1968 authorized the Federal Aviation Administrator, among other things, to revoke or modify an airman certificate if safety in air commerce or air transportation and the public interest require it. Hunting from aircraft or discharging firearms from aircraft and harassing and chasing wildlife at low altitudes would certainly produce a safety hazard. Acting under the powers of the Congress to regulate interstate commerce, which would include licensing of aircraft operators, it would be appropriate to authorize the Administrator to regulate the performance and behavior of aircraft and their pilots and operators. Accordingly, the Federal Aviation Act of 1958 would be amended to give the Administrator the authority to amend, modify, suspend, or revoke any airman certificate upon the conviction of such holder of any violation under section 1 of the reported bill."
*Id.* at 1738.

While the quoted statement is not totally clear, I interpret it as a finding that use of aircraft in the described manner poses more than a minimal hazard to interstate air commerce. There was evidence before the Subcommittee on Fisheries and Wildlife Conservation of the Committee on Merchant Marine and Fisheries of the House of Representatives of property damages and at least one death resulting from plane crashes occurring during the course of activities now banned by the legislation. One accident involved a mid-air collision between two planes, both apparently pursuing coyotes. Although the remark in the Senate Report concerning safety was made in the discussion of that part of H.R. 5080 which amended the Federal Aviation Act, I think the finding has equal bearing on Congress' decision to make such conduct a crime.

Like the *Synnes* court, I cannot say that the means employed by Congress—criminal sanctions—are "unreasonable or inappropriate means for eliminating the evil perceived by Congress." *United States v. Synnes*, 438 F.2d at 768.

I recognize that the Justice Department expressed doubts about the constitutionality of the legislation.[3] Nevertheless, I find that the legislation was within Congress' power to enact.[4]

IT THEREFORE HEREBY IS ORDERED that the motions to dismiss, filings 28, 30 and 32, are denied.

---

3. Letter to Hon. Warren G. Magnuson from Richard G. Kleindienst, Deputy Attorney General, dated June 8, 1971, 1971 U.S.Code Cong. & Admin.News, pp. 1743–45.

4. A major purpose of the bill probably was to curb the "unsportsmanlike" use of planes to hunt. H.Rep.No.92–202, 92d Cong., 1st Sess. at 4. Whether that goal alone or some broader environmental aim alone would justify this legislation is an issue I need not decide.