POSNER, Circuit Judge,
concurring.
I agree that we should reverse, and I join the majority opinion, but I wish to explore an alternative approach that may be more straightforward.
It is helpful to note at the outset that the interpretation of statutes comes in three flavors. The first and most conventional is the extraction of the original meaning of the statute — the meaning intended by the legislators — and corresponds to interpretation in ordinary discourse. Knowing English I can usually determine swiftly and straightforwardly the meaning of a statement, oral or written, made to me in English (not always, because the statement may be garbled, grammatically intricate or inaccurate, obtuse, or complex beyond my ability to understand).
The second form of interpretation, illustrated by the commonplace local ordinance which commands “no vehicles in the park,” is interpretation by unexpressed intent, whereby we understand that although an ambulance is a vehicle, the ordinance was not intended to include ambulances among the “vehicles” forbidden to enter the park. This mode of interpretation received its definitive statement in Blackstone’s analysis of the medieval law of Bologna which stated that “whoever drew blood in the streets should be punished with the utmost severity.” William Blackstone, Commentaries on the Laws of England *60 (1765). Blackstone asked whether the law should have been interpreted to make punishable a surgeon “who opened the vein of a person that fell down in the street with a fit.” (Bleeding a sick or injured person was a common form of medical treatment in those days.) Blackstone thought not, remarking that as to “the effects and consequence, or the spirit and reason of the law ... the rule is, where words bear either none, or a very absurd signification, if literally understood, we must a little deviate from the received sense of them.” Id. *59-60. The law didn’t mention surgeons, but Blackstone thought it obvious that the legislators, who must have known something about the medical activities of surgeons, had not intended the law to apply to them. And so it is with ambulances in parks that prohibit vehicles.
Finally and most controversially, interpretation can mean giving a fresh meaning to a statement (which can be a statement found in a constitutional or statutory text) — a meaning that infuses the statement with vitality and significance today. An example of this last form of interpretation — the form that in my mind is most clearly applicable to the present case — is the Sherman Antitrust Act, enacted in 1890, long before there was a sophisticated understanding of the economics of monopoly and competition. Times have changed; and for more than thirty years the Act has been interpreted in conformity to the modern, not the nineteenth-century, understanding of the relevant economics. The Act has thus been updated by, or in the name of, judicial interpretation — the form of interpretation that consists of making old law satisfy modern needs and understandings. And a common form of interpretation it is, despite its flouting “original meaning.” Statutes and constitutional provisions frequently are interpreted on the basis of present need and present understanding rather than original meaning— constitutional provisions even more fre *353 quently, because most of them are older than most statutes.
Title VII of the Civil Rights Act of 1964, now more than half a century old, invites an interpretation that will update it to the present, a present that differs markedly from the era in which the Act was enacted. But I need to emphasize that this third form of interpretation — call it judicial interpretive updating — presupposes a lengthy interval between enactment and (re)interpretation. A statute when passed has an understood meaning; it takes years, often many years, for a shift in the political and cultural environment to change the understanding of the statute.
Hively, the plaintiff, claims that because she’s a lesbian her employer declined to either promote her to full-time employment or renew her part-time employment contract. She seeks redress on the basis of the provision of Title VII that forbids an employer “to fail or refuse to hire[,] or to discharge[,] any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s ... sex....” 42 U.S.C. § 2000e-2(a)(l).
The argument that firing a woman on account of her being a lesbian does not violate Title VII is that the term “sex” in the statute, when enacted in 1964, undoubtedly meant “man or woman,” and so at the time people would have thought that a woman who was fired for being a lesbian was not being fired for being a woman unless her employer would not have fired on grounds of homosexuality a man he knew to be homosexual; for in that event the only difference between the two would be the gender of the one he fired. Title VII does not mention discrimination on the basis of sexual orientation, and so an explanation is needed for how 53 years later the meaning of the statute has changed and the word “sex” in it now connotes both gender and sexual orientation.
It is well-nigh certain that homosexuality, male or female, did not figure in the minds of the legislators who enacted Title VIL I had graduated from law school two years before the law was enacted. Had I been asked then whether I had ever met a male homosexual, I would have answered: probably not; had I been asked whether I had ever met a lesbian I would have answered “only in the pages of A la recherche du temps perdu.” Homosexuality was almost invisible in the 1960s. It became visible in the 1980s as a consequence of the AIDS epidemic; today it is regarded by a large swathe of the American population as normal. But what is certain is that the word “sex” in Title VII had no immediate reference to homosexuality; many years would elapse before it could be understood to include homosexuality.
A diehard “originalist” would argue that what was believed in 1964 defines the scope of the statute for as long as the statutory text remains unchanged, and therefore until changed by Congress’s amending or replacing the statute. But as I noted earlier, statutory and constitutional provisions frequently are interpreted on the basis of present need and understanding rather than original meaning. Think for example of Justice Scalia’s decisive fifth vote to hold that burning the American flag as a political protest is protected by the free-speech clause of the First Amendment, provided that it’s your flag and is not burned in circumstances in which the fire might spread. Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); United States v. Eichman, 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990). Burning a flag is not speech in the usual sense and there is no indication that the framers or ratifiers of the First Amendment thought that the *354 word “speech” in the amendment embraced flag burning or other nonverbal methods of communicating.
Or consider the Supreme Court’s holding that the Fourth Amendment requires the issuance of a warrant as a precondition to searching a person’s home or arresting him there. E.g., Johnson v. United States, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948). There is nothing in the amendment about requiring a warrant ever. All that the amendment says about warrants is that general warrants, and warrants that are vague or issued without probable cause, are invalid. In effect the Supreme Court rewrote the Fourth Amendment, just as it rewrote the First Amendment in the flag-burning cases, and just as it rewrote the Sherman Act, and just as today we are rewriting Title VII. We are Blackstone’s heirs.
• And there is more: think of how the term “cruel and unusual punishments” has morphed over time. Or how the Second Amendment, which as originally conceived and enacted was about arming the members of the state militias (now the National Guard), is today interpreted to confer gun rights on private citizens as well. Over and over again, old statutes, old constitutional provisions, are given new meaning, as explained so eloquently by Justice Holmes in Missouri v. Holland, 252 U.S. 416, 433-34, 40 S.Ct. 382, 64 L.Ed. 641 (1920):
When we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters.... The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago. The treaty in question does not contravene any prohibitory words to be found in the Constitution. The only question is whether it is forbidden by some invisible radiation from the general terms of the Tenth Amendment. We must consider what this country has become in deciding what that amendment has reserved (emphasis added).
So by substituting Title VII for “that amendment” in Holmes’s opinion, discrimination on grounds of “sex” in Title VII receives today a new, a broader, meaning. Nothing has changed more in the decades since the enactment of the statute than attitudes toward sex. 1964 was more than a decade before Richard Raskind underwent male-to-female sex reassignment surgery and took the name Renée Richards, becoming the first transgender celebrity; now of course transgender persons are common.
In 1964 (and indeed until the 2000s), and in some states until the Supreme Court’s decision in Obergefell v. Hodges, — U.S. -, 135 S.Ct. 2584, 192 L.Ed.2d 609 (2015), men were not allowed to marry each other, nor women allowed to marry each other. If in those days an employer fired a lesbian because he didn’t like lesbians, he would have said that he was not firing her because she was a woman — he would not have fired her had she been heterosexual — and so he was not discriminating on the basis of sex as understood by the authors and ratifiers of Title VII. But today “sex” has a broader meaning than the genitalia you’re born with. In Baskin v. Bogan, 766 F.3d 648 (7th Cir. 2014), our court, anticipating Obergefell by invalidating laws in Indiana and Wisconsin that forbade same-sex marriage, discussed at length whether homosexual orientation is innate or chosen, and found that the scientific literature strongly supports the proposition that it is biological and innate, not a choice like deciding how to dress. The position of a woman discriminated against *355 on account of being a lesbian is thus analogous to a woman’s being discriminated against on account of being a woman. That woman didn’t choose to be a woman; the lesbian didn’t choose to be a lesbian. I don’t see why firing a lesbian because she is in the subset of women who are lesbian should be thought any less a form of sex discrimination than firing a woman because she’s a woman.
But it has taken our courts and our society a considerable while to realize that sexual harassment, which has been pervasive in many workplaces (including many Capitol Hill offices and, notoriously, Fox News, among many other institutions), is a form of sex discrimination. It has taken a little longer for realization to dawn that discrimination based on a woman’s failure to fulfill stereotypical gender roles is also a form of sex discrimination. And it has taken still longer, with a substantial volume of cases struggling and failing to maintain a plausible, defensible line between sex discrimination and sexual-orientation discrimination, to realize that homosexuality is nothing worse than failing to fulfill stereotypical gender roles.
It’s true that even today if asked what is the sex of plaintiff Hively one would answer that she is female or that she is a woman, not that she is a lesbian. Lesbianism denotes a form of sexual or romantic attraction; it is not a physical sex identifier like masculinity or femininity. A broader understanding of the word “sex” in Title VII than the original understanding is thus required in order to be able to classify the discrimination of which Hively complains as a form of sex discrimination. That broader understanding is essential. Failure to adopt it would make the statute anachronistic, just as interpreting the Sherman Act by reference to its nineteenth-century framers’ understanding of competition and monopoly would make the Sherman Act anachronistic.
We now understand that homosexual men and women (and also bisexuals, defined as having both homosexual and heterosexual orientations) are normal in the ways that count, and beyond that have made many outstanding intellectual and cultural contributions to society (think for example of Tchaikovsky, Oscar Wilde, Jane Addams, André Gide, Thomas Mann, Marlene Dietrich, Bayard Rustin, Alan Turing, Alec Guinness, Leonard Bernstein, Van Cliburn, and James Baldwin — a very partial list). We now understand that homosexuals, male and female, play an essential role, in this country at any rate, as adopters of children from foster homes — a point emphasized in our Baskin decision. The compelling social interest in protecting homosexuals (male and female) from discrimination justifies an admittedly loose “interpretation” of the word “sex” in Title VII to embrace homosexuality: an interpretation that cannot be imputed to the framers of the statute but that we are entitled to adopt in light of (to quote Holmes) “what this country has become,” or, in Blackstonian terminology, to embrace as a sensible deviation from the literal or original meaning of the statutory language.
I am reluctant however to base the new interpretation of discrimination on account of sex in Title VII on such cases as Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), a case of sexual harassment of one man by other men, held by the Supreme Court to violate Title VII’s prohibition of sex discrimination. The Court’s opinion is rather evasive. I quote its critical language:
As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal *356 evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits “discrimination] ... because of ... sex” in the “terms” or “conditions” of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements.
Id. at 79-80, 118 S.Ct. 998.
Consider the statement in the quotation that “statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed” (emphasis added). That could be thought “originalism,” if by “provisions” is meant statutory language. Consider too the statement in Oncale that “Title VII prohibits ‘discrimination] ... because of ... sex’ in the ‘terms’ or ‘conditions’ of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements.” Although “of any kind” signals breadth, it is narrowed by the clause that follows: “that meets the statutory requirements.” So we’re back to the essential issue in this case, which is whether passage of time and concomitant change in attitudes toward homosexuality and other unconventional forms of sexual orientation can justify a fresh interpretation of the phrase “discriminat[ion] ... because of ... sex” in Title VII, which fortunately however is a half-century-old statute ripe for reinterpretation.
Another decision we should avoid in ascribing present meaning to Title VII is Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), which Hively argues protects her right to associate intimately with a person of the same sex. That was a constitutional case, based on race. It outlawed state prohibitions of interracial marriage. It had nothing to do with the recently enacted Title VII.
The majority opinion in the present case states that “Ivy Tech is disadvantaging [Hively] because she is a woman,” not a man, who wants to have romantic attachments with female partners (emphasis in original). In other words, Ivy Tech is disadvantaging her because she is a woman who is not conforming to its notions of proper behavior. That’s a different type of sex discrimination from the classic cases of old in which women were erroneously (sometimes maliciously) deemed unqualified for certain jobs. That was the basis on which fire departments, for example, discriminated against women — an example of discrimination plainly forbidden by the language of Title VII.
The most tenable and straightforward ground for deciding in favor of Hively is that while in 1964 sex discrimination meant discrimination against men or women as such and not against subsets of men or women such as effeminate men or mannish women, the concept of sex discrimination has since broadened in light of the recognition, which barely existed in 1964, that there are significant numbers of both men and women who have a sexual orientation that sets them apart from the heterosexual members of their genetic sex (male or female), and that while they constitute a minority their sexual orientation is not evil and does not threaten our society. Title VII in terms forbids only sex discrimination, but we now understand discrimination against homosexual men and women to be a form of sex discrimination; and to paraphrase Holmes, “We must con *357 sider what this country has become in deciding what that [statute] has reserved.”
The majority opinion states that Congress in 1964 “may not. have realized or understood the full scope of the words it chose.” This could be understood to imply that the statute forbade discrimination against homosexuals but the framers and ratifiers of the statute were not smart enough to realize that. I would prefer to say that theirs was the then-current understanding of the key word — sex. “Sex” in 1964 meant gender, not sexual orientation. What the framers and ratifiers understandably didn’t understand was how attitudes toward homosexuals would change in the following half century. They shouldn’t be blamed for that failure of foresight. We understand the words of Title VII differently not because we’re smarter than the statute’s framers and ratifiers but because we live in a different era, a different culture. Congress in the 1960s did not foresee the sexual revolution of the 2000s. What our court announced in Doe v. City of Belleville, 119 F.3d 563, 572 (7th Cir. 1997), is what Congress had declared in 1964: “the traditional notion of ‘sex.’ ”
I would prefer to see us acknowledge openly that today we, who are judges rather than members of Congress, are imposing on a half-century-old statute a meaning of “sex discrimination” that the Congress that enacted it would not have accepted. This is something courts do fairly frequently to avoid statutory obsolescence and concomitantly to avoid placing the entire burden of updating old statutes on the legislative branch. We should not leave the impression that we are merely the obedient servants of the 88th Congress (1963-1965), carrying out their wishes. We are not. We are taking advantage of what the last half century has taught.