UNITED STATES of America,
Plaintiff,

v.

John David CONTRADES, Defendant.

Cr. No. 11556.

United States District Court
D. Hawaii.

July 20, 1961.

Louis B. Blissard, U. S. Atty., Honolulu, Hawaii, for plaintiff.

E. E. Wiles, Honolulu, Hawaii, for defendant.

TAVARES, Chief Judge.

In this case, the defendant, John David Contrades, was indicted under 18 U.S. Code, Sec. 1403, the charge reading as follows:

"That on or about January 14, 1961, * * * John David Contrades did use a communication facility, to-wit, a telephone, in committing and in causing and facilitating the commission of, and in attempting to commit, an act and acts constituting an offense and offenses, the penalty for which is provided in subsection (c) of Section 2 of the Narcotic Drugs Import and Export Act, as amended (Sec. 174, Title 21, United States Code), to-wit, the sale and facilitation of the sale of heroin, a narcotic drug, which had been fraudulently and knowingly imported and brought into the United States contrary to law, knowing the same to have been imported and brought into the United States contrary to law, in violation of Section 1403 of Title 18, United States Code."

The case was tried before a jury.

The evidence in substance was as follows: City and County of Honolulu policeman Keala on the Vice Squad testified to a "stakeout" of ground-floor apartment G (held in the name of Harold Takashima) at a Kaioo Street address, during a period from about January 11 to January 17, 1961, during which various members of the City Police Department, in cooperation with Federal officers, observed, from outside Apartment G and from a second story apartment above Apartment G, what was "going on" therein, after having received a tip from an undisclosed source that narcotics might be being dispensed from or at that address.

The officer Keala testified that the stakeout or surveillance was not on a continuous twenty-four hour basis during the seven or eight-day period of surveillance, but that on every day, except one (and that one *after* January 14) for a period of several hours, sometimes six to seven hours a day, one or more of the stakeout team observed the goings-on in Apartment G, insofar as they could see from the outside, through open doors or windows, and by listening, that the defendant Contrades and one Tengan were in this apartment "most of the times" from March 11 to 14, and other individuals also were there during this period; that on January 14, at about 8:30 p. m., (at which time both Tengan and Contrades were in the apartment) through a kitchen window equipped with jalousies (which were apparently partly open but not open enough to see through), Officer Keala, who was listening behind a hedge outside of the premises, heard the sound of a telephone being dialed, and then a "booming low voice" (which he recognized as that of Contrades through having seen and heard him talking in and out of the apartment), saying:

"Willie, you want eight caps?" (Then a pause, followed by the words:) "Tomorrow morning? No, tonight at 9:30."

Qualifying as an expert on underworld terminology of users, buyers and sellers of narcotics, Keala testified that, in the jargon of that group, the word "caps" has a very definite and special meaning, to-wit heroin. This was corroborated by Federal Bureau of Narcotics Agent Grady.

Keala also testified that, at 9:30 that night, a Willie Bright called at the apartment; that this Willie was "supposed to be taking heroin"; that Tengan was outside the apartment when Willie arrived, and welcomed and brought him into the apartment; that Bright left later, but was not talked to, searched or arrested. Neither Contrades nor Tengan is shown by the testimony to have been at the apartment after January 14.

Another City police officer, Straus, and Federal agent Grady, testified that on January 17, 1961, armed with a Federal search warrant, they searched Apartment G, at which time two other persons, Mr. Takashima (the owner or lessee of the apartment) and another were present, and eight capsules of heroin were found

concealed in a bedpost of the bed in the bedroom of the same apartment.

These capsules were analyzed and found to be heroin by City police chemist Tom, who also testified. The capsules of heroin so found on January 17th, were admitted in evidence.

Practically all of the foregoing evidence was objected to by defendant, who also moved for a mistrial and for judgment of acquittal at the close of the government's case.

The motion for mistrial being denied and decision on the motion for judgment of acquittal being reserved by the Court under Rule 29(b) F.R.Crim.P., 18 U.S.C.A., the defendant testified in his defense, substantially as follows:

His residence (which was not near to or at Apartment G); his employment—that he was a cement mason by trade, having last worked at that trade about four months ago, then worked as an organizer for the cement masons' union, but was unemployed in January, 1961, and was collecting unemployment compensation; that, after his arrest, he was evicted from his Lunalilo Home Road address for inability to pay rent; that he did not remember whether on January 14th he was in the Takashima apartment at Kaioo Road, but that he had visited at that apartment more than once, but not as many as ten times, in January of this year, but did not remember the dates; that he had known Takashima for twenty-five years, both of them having lived as boys in Kapaa, Kauai, and having been together in "CC Camp"; that because they were old friends, he would go down and talk to Takashima and look at TV programs there; that he had never telephoned anybody from there except his wife; that he absolutely denied making any telephone call there to a Willie or saying any of the words attributed to him by the government witness; that prior to January 17th when the place had been searched and heroin found there, he had had no knowledge of any heroin kept there; that he had never tried to sell or facilitate the sale of heroin by telephone or otherwise; and that, on the occasions when he did visit Takashima in January, he would stay not longer than one to one and a half hours on any one day.

The foregoing is a fair statement of the *entire* evidence.

The government contended, in substance, as follows:

(1) That 18 U.S.C.A. § 1403, dispenses entirely with the necessity of proving possession of any heroin in connection with a telephone conversation attempting to secure a sale of the same—and that all the prosecution has to do is to prove that the defendant telephone conversationalist used words indicating an attempt and intention to sell or facilitate the sale of heroin, and the offense is complete. This contention of law is discussed in detail later in this decision.

(2) The government further contends, on the factual side, that, taking into consideration all the surrounding circumstances, namely the facts: (a) that the police got "information" or a "tip" as to alleged traffic in heroin at the address in question; (b) that, as a result of this information of undisclosed source, the police (using that term to include both Federal and City and County agents) conducted a "continuous" stakeout from about January 10 or 11 to January 17, 1961; (c) that Contrades and one Tengan (also under indictment for a similar offense) were in the Takashima apartment during some of the daily observation periods during the term of the stakeout for some three days before, and on, January 14th when the alleged telephone conversation occurred; (d) that apparently on January 14, Contrades and Tengan were alone in the apartment until Willie Bright appeared there; (e) that Contrades was heard to dial and speak over the telephone (though not actually seen by the officer stationed outside the window) the words,

"Willie, you want eight caps?" (Pause) "Tomorrow morning? No, tonight at 9:30.";

(f) that a "Willie", whose last name is "Bright" and who was "supposed" to be a

user of heroin, did call at the apartment at the time appointed in the telephone conversation—9:30 p. m., and was welcomed and taken by Tengan into the apartment; (g) that three days later, on January 17, the end of the so-called single or "continuous" stakeout period for this one apartment, as a result of this "tip", eight capsules of heroin were actually discovered hidden in a bedpost in the apartment, with Takashima and another present:—there is sufficient evidence of guilt to be submitted to the jury, and that from this evidence, in connection with the surrounding circumstances, the jury could infer that there had been a continuous operation from January 10 to 17, during which heroin was stocked or held in possession in the apartment, this inference to be aided by an interpretation of the word "caps" to mean heroin, and by the further inference that Contrades then had in his possession, actually or constructively, heroin to be sold when he asked if Willie wanted eight caps (heroin).

I take up the government's second contention first, in the order of the alleged facts and contentions above stated.

At its very best, and stretching every possible inference or implication to the extreme against defendant, this evidence is insufficient to convict, even if the government's contentions as to the applicable law be assumed to be correct. Bearing in mind that the evidence must prove, beyond a reasonable doubt, that the defendant attempted by the telephone conversation to sell or facilitate the sale of *heroin*, let us examine the same.

■ (a) The fact that the police got a "tip" or "information" as to alleged narcotics activity at a given address is not evidence on the merits as to the defendant's guilt or innocence. Its only relevance could be on the question of probable cause to justify an arrest and/or a search and seizure, a question not involved in this case, since the defendant made no claim of any alleged illegal search and seizure. It has no significance whatsoever in this case. But even such a tip, without more, would be insufficient to justify an arrest or a search and seizure. United States v. Tom Yu, D.C.Ariz.1932, 1 F.Supp. 357.

(b) As to the claim of a "continuous" stakeout or a single continuous sustained operation at this address based on the same "tip", the evidence fails to sustain even this contention. Accepting all of the government's evidence at its face value on this point, including hearsay on the part of two officers who were there part, but not all, of the times in which the stakeout was being conducted, the surveillance started on January 10th or 11th (the evidence is not clear as to which was the exact date of commencement) and apparently ended on January 17th with the search under a Federal search warrant. But on not a single one of these seven or eight days was the stakeout continuous for twenty-four hours—it was for from five to seven hours a day, "depending" apparently upon circumstances not disclosed by the evidence, and one day, January 15th, was skipped entirely (apparently because it was Sunday). Moreover, neither separately nor collectively were the "surveillants" in a position to see into all the rooms of the apartment and observe all that took place therein at any given time. Under the circumstances, it can not be said that the surveillants were in a position to know with any degree of accuracy all of the people who went into or came out of the Takashima apartment during the "stakeout period", not to speak of all the uncertainties as to what might have gone on in the apartment, even during the actual surveillance, which the surveillants would be unable to observe. Moreover, there is a total lack of any evidence to show that Contrades or even Tengan (if he could be considered to be a confederate of Contrades in this connection) called at or remained in the apartment after January 14, 1961.

■ (c) and (d) The fact that Contrades and Tengan were in the apartment "most of the time" during the three or four days before and on January 14th, and were alone in the apartment the night of January 14th, is rendered in-

conclusive, (1) by the lack of continuous surveillance of the apartment or of Contrades or Tengan even during this period, and (2) by the failure to prove that Willie Bright actually got or negotiated for heroin. Nor would their mere presence in the apartment, even if proved, be sufficient to charge them with knowledge that heroin was hidden in the apartment, under Jackson v. United States, 1957, 102 U.S.App.D.C. 109, 250 F.2d 772. See also Williams v. United States, 9 Cir., 1961, 290 F.2d 451.

■ (e) The words claimed to have been spoken by Contrades over the telephone on January 14th were scanty, and spoken only once. They were ambiguous and had to be interpreted in the light of the special jargon of the narcotics underworld trade, in order to give to them the meaning claimed by the government —that they referred to heroin. Of course, if the evidence had been otherwise sufficient, this question of what was meant could have been submitted to the jury. But it is not out of place here to point out that this statement was in the nature of an admission by the defendant, as to which, one of the standard instructions properly reads:

"All evidence relating to any admission or incriminatory statement claimed to have been made by a defendant outside of court should be considered with caution and weighed with great care." 20 F.R.D. 245.

The government claims that from these words alone, coupled with the finding of the heroin in the same apartment three days later, it can be inferred that defendant was offering to sell heroin and, further, that from this it can be inferred that he was referring to heroin in his actual or constructive possession or control—that is, that this was an admission by him that he then had such possession or control of heroin. Aside from the question as to whether the words are susceptible of an innocent construction or meaning, as opposed to an incriminating one, or whether they were heard accurately, this is an inference which I do not believe was contemplated or is al-lowable under the statutes involved in this case, as taking the place of proof of actual or constructive possession in order to give rise to the statutory presumption of illegal importation and knowledge thereof. It is true that such illegal importation and knowledge could be proved by actual evidence, thereof, other than the statutory presumption raised by proof of actual or constructive possession, but such actual evidence is totally lacking in this case, so far as Contrades is concerned. This legal question is discussed further later.

(f) Did the fact that Willie Bright showed up at 9:30 p. m.—the time stated in the alleged telephone conversation —add anything to the picture? It most certainly is somewhat of a coincidence, assuming that the government's evidence is correct, that a "Willie" showed up at the apartment at the exact time stated in the conversation, but at the most it is only a suspicious circumstance. For one thing, the name "Willie" is a common one and could have referred to any number of persons, and, for another, the testimony was only that Willie Bright was "supposed" to be a heroin user—the exact and only testimony as to this point being:

"Q. What did Willie Bright have to do with narcotics? A. Well he was *supposed* to be taking heroin too, sir." (Italics added.)

This is far from any allegation or proof that Willie Bright was a *known user* or addict of or dealer in heroin. For aught that appears, this supposition might have been just a suspicion in the mind of officer Keala. It illustrates the weaknesses which permeate this entire case.

(g) The heroin found on January 17 obviously cannot be considered to have been in the possession of Contrades since:

(1) He was not the owner or lessee of the apartment;

(2) He was not present in the apartment when the heroin was found, the last time the government's evidence

showed him to have been present in the apartment being three days earlier;

(3) There is no evidence to prove that any of the heroin found on January 17 was there on any of the days Contrades was present; and

(4) No conspiracy was either alleged or proved between Contrades and the two persons found in the apartment on the day the heroin was found, so as to permit the acts or possession of these others to be construed to be the acts or possession of Contrades.

█ Thus, it cannot be said that *any possession of heroin* by Contrades was proved, which would have given rise to the statutory presumptions of illegal importation and knowledge of such illegal importation authorized by section 174. This would dispose of the case were it not for the government's first contention of law above made. This contention in more detail, is in substance, as follows: That 18 U.S.C.A. § 1402 makes the possession of any heroin contraband; that the Court can and should take judicial notice of section 1402 and of the claimed facts, (a) that the importation of opium for the purpose of manufacturing heroin and, of course, the importation of heroin itself, is illegal under present laws and regulations, (b) that heroin cannot legally, under present laws and regulations, be manufactured in the United States, and (c) that, under present laws and regulations, heroin has no allowable medical use; and that, from these alleg-

edly judicially noticeable facts, the Court can and should supply through such judicial notice, the necessary inference or presumption of fact that, if any heroin is attempted to be sold, or sold, in the United States, it must of necessity be heroin that has been illegally imported and, since everybody is presumed to know the law, the defendant must be presumed also to know this. Therefore, the government contends, where section 1403 refers to an act or acts constituting an offense under 21 U.S.C.A. § 174 as amended, which latter section in turn requires, as ingredients of the offense that the heroin sold, attempted to be sold, etc., be illegally imported and that the defendant know that it was so illegally imported, these two requirements are no longer necessary to be proved. Accordingly, the government contends that, even in the absence of proof of illegal importation and knowledge thereof, possession, actual or constructive, which raises the statutory presumptions of such illegal importation and knowledge thereof under section 176, need not be proved in order to convict under section 1403.

An analysis of section 1402 itself throws doubt on the construction claimed for that section.[1]

The section, in terms, appears to apply only to "heroin lawfully possessed prior to the effective date" of the Act.

This seems to be also the interpretation placed thereon by the Secretary of the Treasury in the regulations adopted pursuant to this section.[2]

1. 18 U.S.C.A. § 1402 reads in part: "Any heroin lawfully possessed *prior to the effective date of this Act* shall be surrendered * * * The Secretary of the Treasury, or his designated representative, shall formulate regulations for such procedure. All quantities of heroin not surrendered in accordance with this section and the regulations promulgated thereunder by the Secretary of the Treasury or his designated representative, shall *by him* be declared contraband, seized, and forfeited to the United States without compensation. All quantities of heroin received pursuant to the provisions of this section, or otherwise, shall be disposed of in the manner provided in sec-

tion 4733 of the Internal Revenue Code of 1954, except that no heroin shall be distributed or used for other than scientific research purposes approved by the Secretary of the Treasury, or his designated representative." (Emphasis added.)

2. These regulations, apparently the only ones adopted under that section, are found in 21 CFR, Cum.Poc.Supp. as of Jan. 1, 1960, pages 441 et seq., Part 306 entitled "Surrender of Heroin." Section 306.1 of these regulations provides for surrender within 120 days from July 19, 1956 of all heroin (diacetylmorphine) and compounds containing heroin in the lawful

Thus section 306.3 of the regulations refers only to heroin "heretofore lawfully possessed." Nothing is said about heroin coming into possession in the future, particularly heroin which might possibly, say, in the future, be lawfully manufactured or possessed. Moreover, both section 1402 and the regulations, at least in terms, contemplate the possibility of heroin being in lawful possession in the future, at least for scientific purposes. This certainly militates against reading into section 1402 an absolute prohibition of possession of heroin under any and all circumstances after that section's enactment.

■ A further obstacle to the government's interpretation of section 1402 is the fact that it does not in terms create any crime, or prescribe any penalty by way of fine or imprisonment, as to or against any person for merely possessing the heroin, except to the extent that the heroin itself is to be "declared" contraband and become subject to forfeiture. Because of the doubt raised by the foregoing circumstances, including the failure of the Treasury Department in its regulations to declare contraband any heroin except that "heretofore lawfully

possessed", I am impelled to hold that section 1402 does not, by itself, render mere possession of all heroin thereafter illegal.

■ The government's contention as to section 1402 in essence amounts to a claim that 18 U.S.C.A. § 1403 and 21 U.S.C.A. § 174, as amended, are further amended by implication by section 1402 to the extent of dispensing with any requirement of proof of possession (with its presumptions of unlawful importation and knowledge thereof), or, in the alternative, dispensing with any proof of actual unlawful importation and proof of actual knowledge thereof. The fallacy of this contention is obvious from the fact that the same section which enacted sections 1402 and 1403, also expressly caused section 1403 to refer to 21 U.S.C.A. § 174, and then amended such section 174 without including the implied amendment claimed by the government.[3]

On the other hand, assuming that the Court can take judicial notice of the following facts contended for by the government: (1) that the importation of opium for the purpose of manufacturing heroin is prohibited,[4] (2) that heroin cannot legally, under present laws and

---

possession of the registrant, and for compensation to be paid therefor. Section 306.2 relates to heroin upon which a tax has been paid, and requires filing of an inventory, etc. The remaining sections of these regulations read as follows:

"§ 306.3 *Forfeiture of heroin.* All heroin *heretofore* lawfully possessed by any registrant and not surrendered in accordance with §§ 306.1 and 306.2 shall after the 16th day of November 1956, be seized and forfeited to the United States without compensation." (Emphasis added.)

"§ 306.4 *Disposition of surrendered and forfeited heroin. All heroin acquired by the United States pursuant to section 1402* of title 18 of the United States Code shall be disposed of in accordance with the provisions of 4773 of the Internal Revenue Code of 1954." (Emphasis added.)

"§ 306.5 *Heroin for scientific research purposes.* Any heroin acquired under the provisions of *section 1402* of title 18 of the United States Code, shall be available, in the discretion of the Commissioner

of Narcotics, for scientific research purposes in accordance with the provisions of section 4733 of the Internal Revenue Code of 1954." (Emphasis added.)

3. Amendments or repeals by implication are not favored. United States v. Madigan, 1937, 300 U.S. 500, 506, 57 S.Ct. 566, 81 L.Ed. 767; 50 Am.Jur., Statutes 542, § 538. Statutes are to be so construed as, if possible, to give effect to every part. 50 Am.Jur., Statutes 361–364, § 358; id. 367–369, § 363; id. 481–482, § 468.

4. 21 U.S.C.A. § 173 provides: "It is unlawful to import or bring any narcotic drug into the United States or any territory under its control or jurisdiction; except that such amounts of crude opium and coca leaves as the board finds to be necessary to provide for medical and legitimate uses only, may be imported and brought into the United States or such territory under such regulations as the board shall prescribe, but no crude opium

regulations, be manufactured in the United States; [4] (3) that under present laws and regulations heroin has no allowable medical use [4] —even then I am

unable to see where that would help the government to prove a violation under section 1403. If the mere possession of heroin anywhere and under any circum-

may be imported or brought in for the purpose of manufacturing heroin. * * "

The Convention for Limiting the Manufacture and Regulating the Distribution of Narcotic Drugs dated July 12, 1931, contains a provision found in 48 Stat., Part 2, page 1565, Chapter IV, Article 10, reading as follows:

"1. The High Contracting Parties *shall prohibit the export* from their territories of *diacetylmorphine*, its salts, and preparations containing diacetylmorphine, or its salts.

"2. Nevertheless, on the receipt of a request from the Government of any country in which diacetylmorphine is not manufactured, any High Contracting Party may authorise the export to that country of such quantities of diacetylmorphine, its salts, and preparations containing diacetylmorphine or its salts, as are necessary for the medical and scientific needs of that country, provided that the request is accompanied by an import certificate and is consigned to the Government Department indicated in the certificate.

"3. Any quantities so imported shall be distributed by and on the responsibility of the Government of the importing country." (Emphasis added.)

Perhaps the Court can also take judicial notice of some generally known facts stated in official publications such as the Hearings before the Subcommittee of the House Ways and Means Committee of the 84th Congress above mentioned, including the following:

Statement of Mrs. Lois Higgins, Director of Crime Prevention Bureau, of Illinois, to the effect that " * * * we in law enforcement could throw the problem of all the other drugs out of the window —with the exception of marihuana and heroin, the real problems—*both illegal drugs, both having no legal nor medical standing in this country*, but both being used by 65 to 70 percent of the addicts, not only here but throughout the United States." (Hearings page 999; emphasis added).

Also the same Mrs. Higgins quoting from a text book being written by Dr. Fitzpatrick and herself with reference to heroin, "21. There is *no legal authority or medical need for the import, manufacture, sale or possession of heroin. Being forbidden by Federal law, heroin is an outlaw drug, a contraband drug, a bootleg drug.*"

\* \* \* \* \*

"25. All the narcotics that we control today are controlled by international agreement, and by having this international agreement we are able to look to that for our control powers to limit manufacture and to license the manufacturing, but we control the imports of raw material and allot it to the manufacturers, *and we have only three * * *.*" (Hearings page 1014; emphasis added.)

\* \* \* \*

"*Although there is no medicinal use for heroin in medicine, and physicians cannot prescribe it, druggists are prohibited from handling it,* the fact remains that heroin is the most widely used drug among addicts today. Heroin capsules sell for $1.50 each and have been readily available, according to addicts questioned. The public is aroused, as well it should be, but in view of the increased traffic in heroin, keeps demanding to know where it is coming from and why the Federal government does not provide greater protection against the illicit importation of it." (Hearings page 1024; emphasis added.)

Statement of Mr. Albert E. Amen, District Supervisor, United States Treasury Department, Bureau of Narcotics, District 9: "The principal narcotic drug used in this district illicitely is heroin, which is injected by a hypodermic needle. *It is a drug that must be smuggled into the United States, as it has been ruled off the American market for all purposes by the Congress of the United States.*" (Hearings page 1072; emphasis added.)

Statement of Harry J. Anslinger, Commissioner, Bureau of Narcotics: "Mr. Anslinger: Under our treaty obligations, we are obliged to limit the manufacture of opium alkaloids and scientific drugs to the medical needs of the United States. We are accomplishing that at the present time without legislation. *We do not have the power to license the opium alkaloids manufacturers or the scientific-drug manufacturers or to fix quotas. We do it indirectly by a registration with the Collector of Internal Revenue, * * *.* There is a need for legislation to license the manufacture of both opium alkaloids and synthetic drugs." (Hearings, pages 1111 and 1112; emphasis added.)

Report of the special Committee on Narcotics and the Council on Law Enforcement, District of Columbia: " * * * but the main problem throughout recent years continues to be *heroin which, of*

stances is to be made illegal, it would seem necessary, in the light of the decisions hereinafter cited, to attribute the exercise by Congress of this absolute prohibition of possession, without any connection with commerce or federal taxation, to the treaty power and the various international conventions for the control of the narcotics traffic. Can we constitutionally do so?

■ A careful study of the history of the Federal Narcotics Control laws, including the various treaties and conventions relating thereto, too lengthy and numerous to be here specifically detailed, discloses that, from the very inception, these statutes, and particularly section 174 and its predecessors, have been bottomed on the taxing power of Congress or on the power to regulate foreign and interstate commerce.[5] The Federal decisions in which the constitutionality of this type of legislation has been raised contain numerous statements expressly or tacitly holding or assuming that Congress would be without power to prohibit or regulate a purely intrastate transaction in narcotics not linked in

---

*course, is illegal even in the sense that the medical profession is excluded from using it * * *."* (Hearings page 1284; emphasis added.)

Statement of Senator Wiley: "Heroin today represents the principal drug problem faced by the United States. It should be noted that *heroin* (which is five times as potent as morphine) *is not permitted to be manufactured in the United States and in 50 other countries."* (Hearings page 1371; emphasis added.)

A further statement in the Hearings at page 1402 to the effect that under the Opium Licensing Act, *no licenses are* issued because there is no need therefor and that the production of opium poppies in the United States without a license is forbidden. (Hearings page 1402; emphasis added.)

See also the following excerpts from House Report No. 2388 June 19, 1956 (to accompany HR 11619) 2 U.S.Code Congressional and Administrative News 84th Cong. 2d Sess.1956: Report to the full Committee by the Subcommittee on Narcotics: "* * *. *With the exception of heroin,* most drugs have acceptable medical uses when their utilization is strictly in accordance with medically prescribed practices. * * *" (page 3293; emphasis added.)

"The duties of the Bureau of Narcotics include regulatory supervision over all stages of importation and manufacture of narcotics and the registration of physicians, pharmacists, and others concerned with their use. Control of the domestic trade in narcotic drugs for legitimate medical and sceintific needs has been effectively maintained. * * *" (page 3300.)

"The mark-up in heroin sold to addicts in this country runs up to 10,000 percent over its cost at the source." (page 3304.)

*"International controls are the most effective means of eliminating illicit traffic in narcotic drugs, since the basic natural drugs are not found in this country. * * *."* (Page 3308; emphasis added.)

"Even though great strides have been made in controlling the legitimate international trade in narcotic drugs, smuggling continues to present a serious problem because of the tremendous over-production of opium and the narcotics derived from it in various countries. To combat this situation, the Commission on Narcotic Drugs developed the 1953 protocol for world-wide limitation of opium production, which when effective will curtail the illicit narcotic traffic by greatly reducing the narcotic drugs available for smuggling. * * *" (page 3308.)

*Again perhaps the court can judicially notice a report by the Government of the United States of America entitled "Traffic in Opium and other Dangerous Drugs", for the year ended December 31, 1959, at page 11, reading, "No manufactured drugs · are imported lawfully into the United States.* Narcotics are exported under special permit in accordance with treaty obligations. * * *

*"Diacetylmorphine is neither lawfully manufactured in, imported into nor exported from the United States. The importation of opium for the manufacture of diacetylmorphine was prohibited in 1924, and no authorized manufacture of the drug has taken place since that time."* * * * (Emphasis added.)

5. "The Congress shall have power to lay and collect Taxes, Duties, Imports and Excises * * *;

   \*     \*     \*     \*     \*

"To regulate commerce with foreign nations, and among the several States, and with the Indian Tribes." U.S.Const. Art. I, § 8.

some way with foreign or interstate commerce or taxation.[6]

While at least two recent statutes have mentioned treaty enforcement as one of their respective purposes for the enactment of the acts or portions thereof,[7] I have found but one decision,[8] and that a recent one, and based on the expressly stated purpose of the particular provisions involved, which bottoms any of the narcotics laws on the treaty-making power, or on any particular treaty or treaties, as the basis for congressional action, aside from the commerce and tax powers.[9]

■ Moreover, neither the Stutz nor the Eramdjian case actually covered the presently involved sections 1403 and 174. In the light of the Court's decision in State of Missouri v. Holland, 1920, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641, the holding and dictum in the Stutz and Eramdjian cases, and the very strong

undertakings on the part of the United States in the various treaties and conventions relating to the control of narcotic drugs, there appears to be more than a plausible ground today, as contended by the government, for justifying congressional regulation of intrastate transactions in narcotics without tying the same to illegal importation or exportation, or the exercise of the taxing power, but the question is not entirely free from doubt, and if the constitutional question can be avoided by a reasonable construction of the statutes themselves which does not raise such question, this Court should follow that course.[10]

■ Strictly upon ordinary principles of statutory construction, even if Congress can constitutionally dispense with the necessity of proving illegal importation and guilty knowledge thereof, in connection with the offense of using communication media to sell or attempt

---

6. See, for instance, decisions cited under Note 5, to 21 U.S.C.A. § 174, including the following:
   Brolan v. United States, 1915, 236 U.S. 216, 35 S.Ct. 285, 59 L.Ed. 544; Steinfeldt v. United States, 9 Cir., 1915, 219 F. 879 and United States v. Yee Fing, D.C.Mont.1915, 222 F. 154; Shepard v. United States, 9 Cir., 1916, 236 F. 73; United States v. Ah Hung, D.C.N.Y.1917, 243 F. 762; United States v. Jin Fuey Moy, 1916, 241 U.S. 394, 36 S.Ct. 658, 60 L.Ed. 1061; Gee Woo v. United States, 5 Cir., 1918, 250 F. 428; Charley Toy v. United States, 2 Cir., 1920, 266 F. 326; Yee Hem v. United States, 1925, 268 U.S. 178, 45 S.Ct. 470, 69 L.Ed. 904; Hooper v. United States, 9 Cir., 1926, 16 F.2d 868; United States v. Tom Yu, D.C.Ariz. 1932, 1 F.Supp. 357, 359.

7. 18 U.S.C.A. § 1407, reading:
   "(a) In order further to give effect to the obligations of the United States pursuant to the Hague convention of 1912, proclaimed as a treaty on March 3, 1915 (38 Stat. 1912), and the limitation convention of 1931, proclaimed as a treaty on July 10, 1933 (48 Stat. 1571) and in order to facilitate more effective control of the international traffic in narcotic drugs, and to prevent the spread of drug addiction, no citizen of the United States * * *." (July 18, 1956, C. 629, Title II, § 201, 70 Stat. 574).

21 U.S.C.A. § 188, reading:
"It is the purpose of sections 188–188n of this title (1) to discharge more effectively the obligations of the United States under the International Opium Convention of 1912, and the Convention for Limiting the Manufacture and Regulating the Distributing of Narcotic Drugs of 1931; * * * (3) to regulate interstate and foreign commerce in opium poppies; and (4) to safeguard the revenue derived from taxation of opium and opium products." Dec. 11, 1942, c. 720, § 1, 56 Stat. 1045.

8. Stutz v. Bureau of Narcotics, D.C.Cal. 1944, 56 F.Supp. 810.

9. In United States v. Eramdjian, D.C. Cal.1957, 155 F.Supp. 914, cited by the government, 18 U.S.C.A. § 1407 was held constitutional under the Tax and Commerce powers, and although the reference of that section to the treaties is mentioned and the possibility of sustaining the section under the treaty-making power is also mentioned by way of dictum, citing State of Missouri v. Holland, 1920, 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641, the Court appears to prefer to rely upon the commerce power.

10. United States v. Jin Fuey Moy, 1916, 241 U.S. 394, 400, 36 S.Ct. 658, 60 L.Ed. 1061.

or conspire to sell narcotics, in my opinion it has not done so. Section 1403 says,

"Whoever uses any communication facility in committing or in causing or facilitating the commission of, or in attempting to commit, *any act or acts constituting an offense or a conspiracy to commit an offense, the penalty for which is provided in * * * subsection (c), (h), or (i) of section 2* of the Narcotic Drugs Import and Export Act, as amended, (21 USC section 174) * * * shall be imprisoned." (Emphasis added.)

Had Congress intended the statute to mean that whoever should use a communication facility merely for the purpose of selling, etc., narcotics should be guilty of a federal crime, it seems to me it would have said so, instead of, as it did, tying the use of the communication facility to committing, attempting to commit, or conspiring to commit, one of the acts made a crime by other designated federal laws. That Congress did this for the purpose of basing the exercise of its power upon the commerce and tax powers, rather than relying purely upon treaties, seems to be strongly indicated by the history of this very section 1043.[11]

11. Thus, in the printed Hearings Before a Subcommittee of the Committee on Ways and Means, House of Representatives, 84th Congress, on Traffic in and Control of Narcotics, Barbiturates, and Amphetamines, October 13, * * * 1955 and January 30, 1956, which preceded the enactment of this legislation, and upon which the Subcommittee's Report and the full Committee's report were primarily based, the following communications are significant:

(1) Letter of H. Chapman Ross, Acting Secretary of the Treasury, to the Honorable Jere Cooper, Chairman, Committee on Ways and Means, dated June 20, 1955, re H.J.Res. 225 which stated:

"This Department believes that the transfer of the functions of the Bureau of Narcotics to the Department of Justice would be unwise. *The Federal Narcotics Laws are primarily revenue rather than police measures* and the agency which administers them should be in the same department as the Revenue Agency." (Hearings p. 16, emphasis added.)

(2) Letter of Robert W. Minor, Acting Deputy Attorney General, to Chairman Cooper dated August 11, 1955, reading:

"The Department is opposed to the proposed transfer from the Treasury Department to the Department of Justice of the functions of the Bureau of Narcotics. Enforcement of the narcotics laws from the inception has been by the Treasury Department, which is also charged with the enforcement of the other Internal Revenue and Customs laws. The Bureau of Narcotics must necessarily work closely with the Internal Revenue Service in connection with regulation of persons dealing in narcotic drugs and the assessment and collection of taxes and penalties under the narcotics laws. Also under the Interna-

tional Conventions for Limiting the Manufacture and Regulating the Distributing of Narcotic Drugs, 1931, the United States is obligated to maintain a special organization to supervise the trade and supress [sic] illicit traffic in narcotics. Moreover, *the principal narcotics statutes (Harrison Act and Marihuana Tax Act) have been considered revenue laws and their constitutionality upheld as such. Had enforcement of these statutes been placed in the Department of Justice rather than in the Treasury Department, which is the traditional and natural department for enforcement of revenue measures, these laws might have been considered to be police statutes, and the result in the courts might have been different."* (Hearings, p. 17, emphasis added.)

The foregoing hearings are referred to because in House Report No. 2388 dated June 19, 1956 (accompanying HR 11619) of the Committee on Ways and Means of the House of Representatives (2 U.S.Code Congressional and Administrative News, 84th Cong. 2d Sess.1956, pp. 3274 et seq.) particularly at page 3291, the Committee refers to those hearings for detailed information.

This report No. 2388 on the bill HR 11619, which became in part the present section 1403 of Title 18, states among other things, at page 3282,

" * * * at the present time the manufacture, importation, distribution, and use of narcotic drugs are subject to federal, state, and local control and regulation. The basic statute providing federal controls is the Harrison Narcotic Act, enacted in 1914, and subsequently made a part of the Internal Revenue Code. The other two principal federal statutes which specifically control narcotic drugs and marihuana are the Narcotic Drugs Import and Export Act and the Mari-

The circumstances noted seem rather strongly to indicate that, at least as far as section 1403 of Title 18 and section 174 of Title 21 are concerned, Congress intended to base their enactment upon the revenue and commerce powers, and has tailored these sections 1403 and 174 accordingly, and that, although the narcotics control treaties are mentioned as one of the moving causes for legislation in aid thereof, nowhere is there a clear indication that Congress intended to

huana Tax Act. The Harrison Narcotic Act provides the machinery through which the Federal Bureau of Narcotics is able to exercise control over the distribution of narcotic drugs within the country. The Narcotic Drugs Import and Export Act allows the Commissioner of Narcotics to control the importation of opium and coca leaves and the exportation of manufactured narcotic drugs and preparations. It prohibits the importation of opium prepared for smoking purposes. It also prohibits the importation of opium for the manufacture of heroin. The Marihuana Tax Act, by requiring the registration and payment of tax, controls the traffic in marihuana. In addition the United States smuggling law is applicable to the illegal entries of drugs. Your Committee's bill would make the smuggling of marihuana a specific offense under the Narcotic Drugs Import and Export Act.

"The Department of the Treasury is the principal Federal agency with responsibility for the enforcement of these laws. This responsibility rises from the fact that the *Federal Narcotic laws are revenue measures.* * * * " (Emphasis added.)

In the report of the Subcommittee to the Committee on Ways and Means appended to the full Committee Report on HR 11619 (Id. pp. 3289, et seq.) besides making reference to the hearings above mentioned at page 3291, supra, the Subcommittee says,

"*The control of narcotics is through the device of regulatory taxes. This places the legislative jurisdiction over narcotics in the Committee on Ways and Means.*" * * * (Emphasis added.)

At page 3295 the Subcommittee recommends,

"that federal regulation of barbiturates should be on the basis of *the power of congress to regulate interstate commerce rather than through the device of regulatory taxes.*" (Emphasis added.)

because, unlike narcotics, the barbiturates are domestically produced. Again the Subcommittee states, at page 3300,

"*The Federal Narcotic laws are revenue measures and for this reason their enforcement has been the responsibility of the Treasury Department.*" * * * (Emphasis added.)

The Subcommittee Report mentions, at pages 3300 and 3308, certain treaties and international conventions for the control of narcotics, but does not purport to base the power of Congress to enact the proposed statutes in any way upon those treaties, except as follows, referring to the Bureau of Narcotics:

"*As a result of an effort to bring about world-wide control of narcotics, the United States and other nations obligated themselves to establish such an agency by virtue of Act 15 of the Narcotics Limitation Convention of 1931 sponsored by the League of Nations.*" (Id. p. 3300, Emphasis added.)

The Subcommittee also says,

"*International controls* are the most effective means of eliminating illicit traffic in narcotic drugs since the basic natural drugs are not found in this country." * * * (Id. p. 3308, Emphasis added.)

The Subcommittee further says,

"Even though great strides have been made in controlling the legitimate international trade in narcotic drugs, smuggling continues to present a serious problem because of the tremendous over-production of opium and the narcotics derived from it in foreign countries. To combat this situation, the Commission on Narcotic Drugs developed the 1953 protocol for world-wide limitation of opium production, which when effective will curtail the illicit narcotic traffic by greatly reducing the narcotic drugs available for smuggling." * * * (Id. p. 3308).

Finally, the Conference Committee Report No. 2546 on this same bill, found in the same volume of the U.S.Code Congressional and Administrative News, supra, at pages 3315 et seq., states, at page 3319,

"Section 1403 of the conference agreement is similar to the Senate amendment in that these provisions relating to the use of communications facilities are made a part of title 18. Under the conference agreement (as under the House bill) *penalties are provided for any person who uses any communication facility in committing, or conspiring or attempting to commit, any violation of specified provisions of Federal laws applicable to narcotic drugs (including heroin)* and marihuana." * * * (Emphasis added).

enter the intrastate field of narcotics regulation purely upon the basis of the treaties.

Even the indictment itself in this case appears to evidence an agreement by the government with the interpretation of sections 1403 and 174, supra here adopted.[12] The underscored portions of the indictment quoted in footnote number 12 still refer to unlawful importation and knowledge thereof.

But going further, and assuming that Congress could constitutionally, and did, dispense with the necessity of proving illegal importation and knowledge thereof, a conviction could not be justified in this case because of the weaknesses in the evidence itself, pointed out, ante, more particularly the insufficiency to prove beyond a reasonable doubt (1) that Contrades made any offer to sell, or facilitate the sale of, or offered to sell or facilitated the sale of, or attempted to sell or facilitate the sale of *heroin* or (2) that he was in a position *to be able to sell or facilitate the sale of heroin* and so was capable of making an attempt to sell the same.[13] In this connection, cases like United States v. La Rocca,[14] Brown v. United States,[15] United States v. Robles,[16] United States v. Pinna,[17] Simpson v. United States,[18] (cited in the Robles case) and United States v. Quincy,[19] (cited in the Robles case) and Bruno v. United States,[20] (also cited in the Robles case), United States v. Russell,[21] (cited in the Robles case), Pon Wing Quong v. United States,[22] and the like, some of which are cited by the government, are distinguishable from the present case on the facts. While some of them contain language indicating that proof of actual possession is not necessary, or that the words "endeavor" or "facilitate" in a statute can have a broad meaning, in every such case there was evidence that the actual crime there was consummated through proof of the actual sale of the narcotics or article or the actual existence of the contraband article with respect to which the charge was made, and hence the ability of the defendant to consummate the crime if *not somehow arrested or interrupted,* was clear.

A more extended discussion could be entered into distinguishing these various authorities, but would too much prolong this already too lengthy opinion.

Accordingly, the Court has granted the Motion for Judgment of Acquittal, for the reasons above stated.

12. The indictment reads,
"That on or about January 4, 1961, in the District of Hawaii and within the jurisdiction of this Court, JOHN DAVID CONTRADES did use a communication facility, to-wit, a telephone, in committing and in causing and facilitating the commission of, and in attempting to commit, an act and acts constituting an offense and offenses, the penalty for which is provided in subsection (c) of Section 2 of the Narcotic Drugs Import and Export Act, as amended (Section 174, Title 21, United States Code), to-wit, the sale and facilitation of the sale of heroin, a narcotic drug, *which had been fraudulently and knowingly imported and brought into the United States contrary to law, knowing the same to have been imported and brought into the United States contrary to law, in violation of Section 1403 of Title 18, United States Code.*" (Emphasis added.)

13. While no general rule can be laid down as to what constitutes an attempt to commit a crime in all cases, it is said generally that:
"An attempt to commit a crime is any overt act done with the intent to commit the crime and which, except for the interference of some cause preventing the carrying out of the intent, would have resulted in the commission of the crime." 14 Am.Jur., Criminal Law, 813, § 65.

14. 2 Cir., 1955, 224 F.2d 859.

15. 9 Cir., 1955, 222 F.2d 293.

16. D.C.N.D.Cal.1960, 185 F.Supp. 82.

17. 7 Cir., 1956, 229 F.2d 216.

18. 9 Cir., 1952, 195 F.2d 721.

19. 1832, 6 Pet. 445, 31 U.S. 445, 8 L.Ed. 458.

20. 9 Cir., 1958, 259 F.2d 8.

21. 1921, 255 U.S. 138, 41 S.Ct. 260, 65 L.Ed. 553.

22. 9 Cir., 1940, 111 F.2d 751, 756.