# The President and the War Power: South Vietnam and the Cambodian Sanctuaries

Recognizing congressional sanction for the Vietnam conflict by the Gulf of Tonkin resolution, even though it was not in name or by its terms a formal declaration of war, the President's determination to authorize incursion into the Cambodian border area by United States forces in order to destroy sanctuaries utilized by the enemy is the sort of tactical decision traditionally confided to the Commander in Chief in the conduct of armed conflict.

Only if the constitutional designation of the President as Commander in Chief conferred no substantive authority whatever could it be said that prior congressional authorization for such a tactical decision was required. Since even those authorities least inclined to a broad construction of the executive power concede that the Commander in Chief provision does confer substantive authority over the manner in which hostilities are conducted, the President's decision to invade and destroy the border sanctuaries in Cambodia was authorized under even a narrow reading of his power as Commander in Chief.

May 22, 1970

MEMORANDUM OPINION FOR THE SPECIAL COUNSEL TO THE PRESIDENT[*]

The recent decision by President Nixon to use United States armed forces to attack sanctuaries employed by the North Vietnamese and the Viet Cong which were located across the Cambodian border from South Vietnam has raised the issue of the scope for the President's power to conduct military operations such as those now underway in Southeast Asia. This memorandum addresses itself to that issue.

## I. Division of the War Power by the Framers of the Constitution

The draftsmen of the Constitution clearly intended to divide the war power inhering in any sovereign nation between the President and Congress, and just as clearly did not intend to precisely delimit the boundary between the power of the Executive Branch and that of the Legislative Branch. They rejected the traditional power of kings to commit unwilling nations to war to further the king's international political objectives. At the same time, they recognized the need for quick executive response to rapidly developing international situations.

The accommodation of these two interests took place in the session of the Constitutional Convention on Friday, August 17, 1787. The enumeration of the powers of Congress was in the process of being submitted to the delegates, and discussion occurred following the submission to vote of the draft language empowering Congress "to make war."

---

[*] Editor's Note: This memorandum was addressed to Charles W. Colson, Special Counsel to the President. The cover memorandum explained as follows: "Enclosed is an expanded version of the memorandum on Presidential power entitled *The President and the War Power: South Vietnam and the Cambodian Sanctuaries*. I am sending copies to Jack Stevenson and John Lehman."

The full text of the discussion, as reflected in Madison's notes of the proceedings, is set forth as an appendix to this memorandum.* The upshot was that the authority conferred upon Congress was changed from the power "to make war" to the power "to declare war." 3 *The Papers of James Madison* 1351–53 (Henry D. Gilpin ed., 1841) ("Madison Notes"). Charles Pinckney urged that the war-making power be confided to the Senate alone, *id.* at 1351, while Pierce Butler urged that the power be vested in the President, *id.* at 1352. James Madison and Elbridge Gerry then jointly moved to substitute the word "declare" for the word "make," "leaving to the Executive the power to repel sudden attacks." *Id.* John Sherman expressed a preference for "make" as opposed to "declare," because the latter was too narrow a grant of power. However, he expressed the view that the grant of power to Congress to "make" war would nonetheless permit the Executive to repel attack, although not to commence war. *Id.* Gerry and George Mason opposed the giving of the power to declare war to the Executive. *Id.* Rufus King supported the substitution of the word "declare," urging that the word "make" might be understood to mean "conduct" war, which latter was an executive function. *Id.* at 1353 n.*.

With only New Hampshire dissenting, it was agreed that the grant to Congress should be of the power to *declare* war. Pinckney's motion to strike out the whole clause, and thereby presumably to leave the way open to vest the entire war-making power in the Executive, was then defeated by a voice vote. *Id.* at 1353.

The framers of the Constitution, in making this division of authority between the Executive and the Legislative Branches, were painting with a broad brush on a constitutional fabric, and not endeavoring to accomplish a detailed allocation of authority between the two branches. Nearly 200 years of practice under the constitutional system has given rise to a number of precedents and usages, although it cannot be confidently said that any sharp line of demarcation exists as a result of this history.

## II. Recognition of Armed Conflict Short of "War"

Before turning to historical practice for the light which it throws upon the proper interpretation of the President's power, it is well to first dispel any notion that the United States may lawfully engage in armed hostilities with a foreign power only if Congress has declared war. From the earliest days of the republic, all three branches of the federal government have recognized that this is not so, and that not every armed conflict between forces of two sovereigns is "war." This fact affords no final answer to the constitutional question of the division of authority between the President and Congress in exercising the war power, but it

---

* Editor's Note: That appendix was not preserved in the OLC daybooks and so it is not included here. Instead we have inserted citations to the appropriate parts of Madison's notes on the Constitutional Convention.

does suggest that the effort to find an answer is not advanced by a mechanical application of labels to various fact situations.

Congress, during the so-called "undeclared war" with France which lasted from 1798 to 1800, authorized limited use of this nation's armed forces against those of France. The Fifth Congress authorized President Adams to take the following measures:

> That the President of the United States shall be, and is hereby authorized to instruct the commanders of the public armed vessels which are, or which shall be employed in the service of the United States, to subdue, seize and take any armed French vessel, which shall be found within the jurisdictional limits of the United States, or elsewhere, on the high seas, and such captured vessel, with her apparel, guns and appurtenances, and the goods or effects which shall be found on board the same, being French property shall be brought within some port of the United States, and shall be duly proceeded against and condemned as forfeited . . . .

Act of July 9, 1798, ch. 68, § 1, 1 Stat. 578, 578.

The Supreme Court in a case arising out of this "undeclared war" described these differences between war and other armed conflicts as being differences between "solemn war" and "imperfect war":

> If it be declared in form, it is called *solemn*, and is of the perfect kind; because one whole nation is at war with another whole nation; and *all* the members of the nation declaring war, are authorized to commit hostilities against all the members of the other, in every place, and under every circumstance. In such a war all the members act under a general authority, and all the rights and consequences of war attach to their condition.
>
> But hostilities may subsist between two nations more confined in its nature and extent; being limited as to places, persons, and things; and this is more properly termed *imperfect war*; because not solemn, and because those who are authorized to commit hostilities, act under special authority, and can go no farther than to the extent of their commission.

*Bas v. Tingy (The Eliza)*, 4 U.S. (4 Dall.) 37, 40 (1800) (opinion of Washington, J.).

While the Court termed both forms of military action "war," the distinction which it drew likewise separates the declared wars of the Twentieth Century, such as the two World Wars, and the undeclared armed conflicts such as have more recently occurred in Korea and in Southeast Asia. In both of the two World Wars, the declarations of war were viewed by the Executive Branch to authorize

complete subjugation of the enemy, and some form of "unconditional surrender" on the part of the enemy was the announced goal of the allied nations. In Korea and Vietnam, on the other hand, the goals have been the far more limited ones of the maintenance of territorial integrity and of the right of self-determination.

As has been chronicled many times, the United States throughout its history has been involved in armed conflicts short of declared war, from the undeclared war with France in 1798–1800 to Vietnam. *See, e.g.*, H.R. Rep. No. 82-127 (1951); H.R. Doc. No. 84-443 (1956); James Grafton Rogers, *World Policing and the Constitution* 92–123 (1945). The more significant of these involvements are separately discussed in a following section of this memorandum.

### III. Designation of the President as Commander in Chief Is a Grant of Substantive Power

Because of the nature of the President's power as Commander in Chief and because of the fact that it is frequently exercised in external affairs, there are few judicial precedents dealing with the subject. Such judicial learning as there is on the subject, however, makes it reasonably clear that the designation of the President as Commander in Chief of the Armed Forces is a substantive grant of power, and not merely a commission which entitles him to precedence in a reviewing stand.[1]

Chief Justice Marshall, writing for the Supreme Court in *Little v. Barreme*, concluded that the seizure of a ship on the high seas had not been authorized by an act of Congress. In the course of the opinion, he stated:

> It is by no means clear that the President of the *United States* whose high duty it is to "take care that the laws be faithfully execut-ed," and who is Commander in Chief of the armies and navies of the *United States*, might not, without any special authority for that pur-pose, in the then existing state of things, have empowered the offic-ers commanding the armed vessels of the *United States*, to seize and

---

[1] A statement of Alexander Hamilton in *The Federalist* 69 has been quoted in support of the notion that the designation of the President as Commander in Chief does nothing more than place him at the head of the military establishment. The full text of Hamilton's comment does not support such a narrow construction:

> The President is to be Commander-in-Chief of the army and navy of the United States. In this respect his authority would be nominally the same as that of the King of Great Britain, but in substance much inferior to it. It would amount to nothing more than the supreme command and direction of the military and naval forces, as first general and admiral of the Confederacy; while that of the British king extends to the *declaring* of war and to the *raising* and *regulating* of fleets and armies—all which, by the Constitu-tion under consideration, would appertain to the Legislature.

*The Federalist* No. 69, at 417–18 (Clinton Rossiter ed., 1961).

send into port for adjudication, *American* vessels which were forfeited by being engaged in this illicit commerce.

6 U.S. (2 Cranch) 170, 177 (1804).

Justice Grier, speaking for the Supreme Court in its famous decision in the *Prize Cases*, likewise viewed the President's designation as Commander in Chief as being a substantive source of authority on which he might rely in putting down rebellion:

> Whether the President in fulfilling his duties, as Commander in Chief, in suppressing an insurrection, has met with such armed hostile resistance, and a civil war of such alarming proportions as will compel him to accord to them the character of belligerents, is a question to be decided *by him*, and this Court must be governed by the decisions and acts of the political department of the Government to which this power was entrusted. "He must determine what degree of force the crisis demands." The proclamation of blockade is itself official and conclusive evidence to the Court that a state of war existed which demanded and authorized a recourse to such a measure, under the circumstances peculiar to the case.

67 U.S. (2 Black) 635, 670 (1862).

More recently, Justice Jackson, concurring in *Youngstown Sheet & Tube Co. v. Sawyer*, said:

> We should not use this occasion to circumscribe, much less to contract, the lawful role of the President as Commander in Chief. I should indulge the widest latitude of interpretation to sustain his exclusive function to command the instruments of national force, at least when turned against the outside world for the security of our society.

343 U.S. 579, 646 (1952).

The limits of the President's power as Commander in Chief are nowhere defined in the Constitution, except by way of negative implication from the fact that the power to declare war is committed to Congress. However, as a result of numerous occurrences in the history of the Republic, more light has been thrown on the scope of this power.

## IV. Scope of President's Power as Commander in Chief

The questions of how far the Chief Executive may go without congressional authorization in committing American military forces to armed conflict, or in deploying them outside of the United States and in conducting armed conflict already authorized by Congress, have arisen repeatedly throughout the Nation's

history. The Executive has asserted and exercised at least three different varieties of authority under his power as Commander in Chief:

> (a) Authority to commit military forces of the United States to armed conflict, at least in response to enemy attack or to protect the lives of American troops in the field;

> (b) Authority of deploy United States troops throughout the world, both to fulfill United States treaty obligations and to protect American interests; and

> (c) Authority to conduct or carry on armed conflict once it is instituted, by making and carrying out the necessary strategic and tactical decisions in connection with such conflict.

Congress has on some of these occasions acquiesced in the President's action without formal ratification; on others it has ratified the President's action; and on still others it has taken no action at all. On several of the occasions, individual members of Congress, and, at the close of the Mexican War, one house of Congress on a preliminary vote, have protested executive use of the armed forces. While a particular course of executive conduct to which there was no opportunity for the Legislative Branch to effectively object cannot establish a constitutional precedent in the same manner as it would be established by an authoritative judicial decision, a long continued practice on the part of the Executive, acquiesced in by the Congress, is itself some evidence of the existence of constitutional authority to support such a practice. *United States v. Midwest Oil Co.*, 236 U.S. 459 (1915). As stated by Justice Frankfurter in his concurring opinion in *Youngstown Sheet & Tube*:

> The Constitution is a framework for government. Therefore the way the framework has consistently operated fairly establishes that it has operated according to its true nature. Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a text or supply them.

343 U.S. at 610.

### A. Commitment of Military Forces to Armed Conflict Without Congressional Authorization

President Jefferson, in 1801, sent a small squadron of American naval vessels into the Mediterranean to protect United States commerce against threatened attack by the Barbary pirates of Tripoli. In his message to Congress discussing his

action, Jefferson took the view that it would require congressional authorization for this squadron to assume an offensive, rather than a defensive, stance.

In May 1845, President Polk ordered military forces to the coasts of Mexico and to the western frontier of Texas (still at that time an independent republic) in order to prevent any interference by Mexico with the proposed annexation of Texas to the United States. Following annexation, Polk ordered General Zachary Taylor to march from the Nueces River, which Mexico claimed was the southern border of Texas, to the Rio Grande River, which Texas claimed was the southern boundary of Texas. While so engaged, Taylor's forces encountered Mexican troops, and hostilities between the two nations commenced on April 25, 1846. While Polk two and a half weeks later requested a declaration of war from Congress, there had been no prior authorization for Taylor's march south of the Nueces.

Justice Grier, in his opinion for the Supreme Court in the *Prize Cases*, commented on this fact, stating:

> The battles of Palo Alto and Rasaca de la Palma had been fought before the passage of the act of Congress of May 13, 1846, which recognized *"a state of war as existing by the act of the Republic of Mexico."*

67 U.S. at 668.

In 1854, President Pierce approved the action of a naval officer who bombarded Greytown, Nicaragua, in retaliation against a revolutionary government that refused to make reparations for damage and violence to United States citizens. This action was upheld by Samuel Nelson, then a judge of the Southern District of New York and later a Justice of the Supreme Court of the United States, in *Durand v. Hollins*, 8 F. Case. 111 (C.C.D.N.Y. 1860) (No. 4186). In his opinion in that case, Judge Nelson said:

> As the executive head of the nation, the president is made the only legitimate organ of the general government, to open and carry on correspondence of negotiations with foreign nations, in matters concerning the interests of the country or of its citizens. It is to him, also, the citizens abroad must look for protection of person and of property, and for the faithful execution of the laws existing and intended for their protection. For this purpose, the whole executive power of the country is placed in his hands, under the constitution, and the laws passed in pursuance thereof. . . .
>
> . . . Acts of lawless violence, or of threatened violence to the citizen or his property, cannot be anticipated and provided for; and for the protection, to be effectual or of any avail, may, not unfrequently, require the most prompt and decided action. . . .

> . . . The question whether it was the duty of the president to inter-
> pose for the protection of the citizens at Greytown against an irre-
> sponsible and marauding community that had established itself there,
> was a public political question, in which the government, as well as
> the citizens whose interests were involved, was concerned, and
> which belonged to the executive to determine; and his decision is fi-
> nal and conclusive, and justified the defendant in the execution of his
> orders given through the Secretary of the Navy.

*Id.* at 112.

In April 1861, President Lincoln called for 75,000 volunteers to suppress the rebellion by the southern states, and proclaimed a blockade of the Confederacy. The Supreme Court in the *Prize Cases* upheld the acts taken by President Lincoln prior to their later ratification by Congress in July 1861, saying:

> If a war be made by invasion of a foreign nation, the President is
> not only authorized but bound to resist force by force. He does not
> initiate the war, but is bound to accept the challenge without waiting
> for any special legislative authority.

67 U.S. at 668.

In 1900 President McKinley sent an expedition of 5,000 United States troops as a component of an international force during the Boxer Rebellion of China. While Congress recognized the existence of the conflict by providing for combat pay, Act of Mar. 2, 1901, ch. 803, 31 Stat. 895, 903, it neither declared war nor formally ratified the President's action. A federal court, however, reiterated the early recognition of limited or undeclared war:

> In the present case, at no time was there any formal declaration of
> war by the political department of this government against either the
> government of China or the 'Boxer' element of that government. A
> formal declaration of war, however, is unnecessary to constitute a
> condition of war.

*Hamilton v. McClaughry*, 136 F. 445, 449 (C.C.D. Kan. 1905).

Presidents Theodore Roosevelt, Taft, and Wilson on more than one occasion committed American troops abroad to protect American interests. In November 1903, President Roosevelt ordered the United States Navy to guard the Panama area and prevent Colombian troops from being landed in Panama in order to suppress the Panamanian insurrection against Colombia. In his annual report to Congress in 1912, President Taft reported the sending of some 2,000 Marines to Nicaragua (at the request of the President of Nicaragua) and the use of warships and troops in Cuba. H.R. Doc. No. 62-927, at 8–9, 21 (1912). He merely advised Congress of these actions without requesting any statutory authorization.

President Wilson on two separate occasions committed American armed forces to hostile actions in Mexican territory. In April 1914, he directed a force of sailors and Marines to occupy the City of Vera Cruz, during the revolution in that country. The city was seized and occupied for seven months without congressional authorization. In 1916, Wilson ordered General Pershing and more than 10,000 troops to pursue Pancho Villa, the Mexican outlaw, into Mexican territory following the latter's raid on Columbus, New Mexico.

The most recent example of presidential combat use of American armed forces without congressional declaration of war, prior to the Vietnam conflict, was President Truman's intervention in the Korean conflict. Following invasion of South Korea by North Koreans on June 25, 1950, and a request for aid by the United Nations ("UN") Security Council (S.C. Res. 83, U.N. Doc. S/RES/83 (June 27, 1950)), President Truman ordered the United States air and sea forces to give South Korean troops cover and support. He ordered the Seventh Fleet to guard Formosa. On June 30, the President announced that he had authorized the use of United States ground forces in the Korean War, following the collapse of the South Korean Army. Ultimately, the number of troops engaged in the Korean conflict reached 250,000, and the conflict lasted more than three years. President Truman's action without congressional authorization precipitated the "Great Debate" in Congress which raged from January to April 1951.

While the President relied upon the UN Charter as a basis for his action, as well as his power as Commander in Chief, his action stands as a precedent for executive action in committing United States armed forces to extensive hostilities without any formal declaration of war by Congress.

The UN Charter as a result of its ratification by the Senate has the status of a treaty, but it does not by virtue of this fact override any constitutional provision. Though treaties made in pursuance of the Constitution under the Supremacy Clause may override a state statute, *Missouri v. Holland*, 252 U.S. 416 (1920), they may not override specific constitutional limitations, *Geofroy v. Riggs*, 133 U.S. 258 (1890); *Reid v. Covert*, 354 U.S. 1 (1957). If a congressional declaration of war would be required in other circumstances to commit United States forces to hostilities of the extent and nature of those undertaken in Korea, the ratification of the UN Charter would not obviate a like requirement in the case of the Korean conflict. While the issue of presidential power which was the subject of the great debate in Congress was never authoritatively resolved, it is clear that Congress acquiesced in President Truman's intervention in Korea. *See* David Rees, *Korea: The Limited War* (1964); Merlo J. Pusey, *The Way We Go to War* (1969).

## B. Deployment of United States Troops Throughout the World[2]

In February 1917, President Wilson requested from Congress authority to arm American merchant vessels. When that authority failed of passage in Congress as a result of a filibuster, Wilson proceeded to arm them without congressional authority, stating that he was relying on his authority as Commander in Chief.

Near the close of the First World War, President Wilson announced a decision to send American troops to Siberia. The troops so sent remained for over a year, with their withdrawal beginning in January, 1920. There was no congressional authorization for such disposition of troops, and the United States had not declared war on Russia.

In 1941, prior to Pearl Harbor, President Roosevelt utilized his power as Commander in Chief to undertake a series of actions short of war designed to aid the allied forces in the Second World War. On April 9, 1941, he made an agreement with the Danish Minister for the occupation of Greenland by American forces. In May 1941, Roosevelt issued a proclamation declaring an unlimited national emergency, and he ordered American naval craft to "sink on sight" foreign submarines found in the "defensive waters" of the United States. In July 1941, the President announced that United States forces would occupy Iceland in order to relieve British forces there, and that the Navy would perform convoy duty for supplies being sent to Great Britain under Lend-Lease. In September 1941, Roosevelt stated that he had given orders to the United States Army and Navy to strike first at any German or Italian vessels of war in American "defensive waters"; the following month, he decided to carry 20,000 British troops from Halifax to the Middle East in American transports.

President Truman's decision in 1951 to send four United States divisions to Europe in discharge of the nation's NATO commitment occasioned prolonged debate in Congress over his powers to take such action without congressional approval. Congress ultimately acquiesced in the President's action without actually resolving the question, and all of President Truman's successors have asserted and exercised similar authority.

## C. Authority to Conduct or Carry on Armed Conflict Once It Has Been Lawfully Instituted

It has never been doubted that the President's power as Commander in Chief authorizes him, and him alone, to conduct armed hostilities which have been lawfully instituted. Chief Justice Chase, concurring in *Ex parte Milligan*, said:

---

[2] The line between "deploying" forces and "committing them to combat" may be razor thin. Had Zachary Taylor not encountered Mexican resistance below the Nueces, that example could be classified as a "deployment," while if under the orders of President Franklin Roosevelt, discussed *infra*, American naval vessels had sunk on sight a German submarine in the mid-Atlantic, that example could be treated as a "commitment to armed conflict."

> Congress has the power not only to raise and support and govern armies but to declare war. It has, therefore, the power to provide by law for carrying on war. This power necessarily extends to all legislation essential to the prosecution of war with vigor and success, *except such as interferes with the command of the forces and conduct of campaigns. That power and duty belong to the President as commander-in-chief.*

71 U.S. (4 Wall.) 2, 139 (1866) (emphasis supplied).

In the First World War, it was necessary to decide whether United States troops in France would fight as a separate command under General Pershing, or whether United States divisions should be incorporated in existing groups or armies commanded by French or British generals. President Wilson and his military advisers decided that United States forces would fight as a separate command.

In the Second World War, not only similar military decisions on a global scale were required, but also decisions that partook as much of political strategy as they did of military strategy: Should the United States concentrate its military and materiel resources on either the Atlantic or Pacific fronts to the exclusion of the other, or should it pursue the war on both fronts simultaneously? Where should the reconquest of allied territories in Europe and Africa which had been captured by the Axis powers begin? What should be the goal of the allied powers? Those who lived through the Second World War will recall without difficulty, and without the necessity of consulting works of history, that this sort of decision was reached by the allied commanders in chief, and chief executive officers of the allied nations, without (on the part of the United States) any formal congressional participation. The series of conferences attended by President Roosevelt around the world—at Quebec, Cairo, Casablanca, Teheran, Yalta, and by President Truman at Potsdam, ultimately established the allied goals in fighting the Second World War, including the demand for unconditional surrender on the part of the Axis nations.

Similar strategic and tactical decisions were involved in the undeclared Korean War under President Truman. Questions such as whether United States forces should not merely defend South Korean territory, but pursue North Korean forces by invading North Korea, and as to whether American Air Force planes should pursue North Korean and Chinese Communist planes north of the Yalu River, separating Red China from North Korea, were of course made by the President as Commander in Chief without any formal congressional participation.

## V. Constitutional Practice Requires Executive to Obtain Sanction of Congress for Conduct of Major Hostilities

It is too plain from the foregoing discussion to admit of denial that the Executive, under his power as Commander in Chief, is authorized to commit American forces in such a way as to seriously risk hostilities, and also to actually commit them to such hostilities, without prior congressional approval. However, if the

contours of the divided war power contemplated by the framers of the Constitution are to remain, constitutional practice must include executive resort to Congress in order to obtain its sanction for the conduct of hostilities which reach a certain scale. Constitutional practice also indicates, however, that congressional sanction need not be in the form of a declaration of war.

In the case of the Mexican War which was brought about, if not initiated, by the Executive, the President requested and obtained a declaration of war. Congress, meeting in 1861 pursuant to the call of President Lincoln, ratified all of the actions he had taken on his own initiative, and apparently refrained from declaring war on the Confederate States only because it did not wish to recognize them as a sovereign nation.

However, as previously noted, the Fifth Congress authorized President Adams to take certain military action against France without going so far as to declare war. More recently, in connection with President Eisenhower's landing of troops in Lebanon and with the Cuban missile crisis in 1962, Congress has given advance authorization for military action by the President without declaring war. Pub. L. No. 85-7, 71 Stat. 5 (1957); Pub. L. No. 87-733, 76 Stat. 697 (1962).

The notion that such advance authorization by Congress for military operations constitutes some sort of an invalid delegation of congressional war power simply will not stand analysis. A declaration of war by Congress is in effect a blank check to the Executive to conduct military operations to bring about subjugation of the nation against whom war has been declared. The idea that while Congress may do this, it may not delegate a lesser amount of authority to conduct military operations, as was done in the instances referred to above, is both utterly illogical and unsupported by precedent. While cases such as *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), hold that Congress in delegating powers to deal with domestic affairs must establish standards for administrative guidance, no such principle obtains in the field of external affairs. The Supreme Court in *United States v. Curtiss-Wright Exp. Corp.* made this distinction clear:

> Whether, if the Joint Resolution had related solely to internal affairs it would be open to the challenge that it constituted an unlawful delegation of legislative power to the Executive, we find it unnecessary to determine. The whole aim of the resolution is to affect a situation entirely external to the United States, and falling within the category of foreign affairs. . . .

> It will contribute to the elucidation of the question if we first consider the differences between the powers of the federal government in respect of foreign or external affairs and those in respect of domestic or internal affairs. That there are differences between them, and that these differences are fundamental, may not be doubted.

> . . . .

> It results that the investment of the federal government with the powers of external sovereignty did not depend upon the affirmative grants of the Constitution. The powers to declare and wage war, to conclude peace, to make treaties, to maintain diplomatic relations with other sovereignties, if they had never been mentioned in the Constitution, would have vested in the federal government as necessary concomitants of nationality. . . .

> . . . .

> In the light of the foregoing observations, it is evident that this court should not be in haste to apply a general rule which will have the effect of condemning legislation like that under review as constituting an unlawful delegation of legislative power. The principles which justify such legislation find overwhelming support in the unbroken legislative practice which has prevailed almost from the inception of the national government to the present day.

299 U.S. 304, 315, 318, 322 (1936).

What must be regarded as the high water mark of executive action without express congressional approval is, of course, the Korean War. Although Congress never expressly sanctioned the President's action in committing United States forces in the hundreds of thousands to the Korean conflict, it repeatedly voted authorizations and appropriations to arm and equip the American troops. This is not to say that such appropriations are invariably the equivalent of express congressional approval; the decision as to whether limited hostilities, commenced by the Executive, should be sanctioned by Congress may be one quite different from the decision as to whether American troops already committed and engaged in such hostilities shall be equipped and supplied.

### VI. Extent to Which Congress May Restrict by Legislation the Substantive Power Granted the President by Virtue of His Being Designated as Commander in Chief

While the President may commit armed forces of the United States to hostile conflict without congressional authorization under his constitutional power as Commander in Chief, his authority exercised in conformity with congressional authority or ratification of his acts is obviously broader than if it stood alone. By the same token, Congress undoubtedly has the power in certain situations to restrict the President's power as Commander in Chief to a narrower scope than it would have had in the absence of legislation. Chief Justice Marshall strongly intimates in his opinion in *Little v. Barreme* that the executive action directing the seizure of a ship on the high seas would have been valid had not Congress enacted legislation restricting the circumstances under which such a seizure was author-

ized. Congress, exercising its constitutional authority to "make rules concerning captures on land and water," may thus constrict the President's power to direct the manner of proceeding with such captures.

Congress has similarly sought to restrain the authority of the President in the exercise of its power to "raise and support Armies." U.S. Const. art. I, § 8, cl. 12. In the Selective Service and Training Act of 1940, it was provided that:

> Persons inducted into the land forces of the United States under this Act shall not be employed beyond the limits of the Western Hemisphere except in the Territories and possessions of the United States, including the Philippine Islands.

Pub. L. No. 76-783, § 3(e), 54 Stat. 885, 886 (1940).

In the year following enactment of this law, President Roosevelt determined to send United States troops, including draftees, to Iceland in order to relieve British troops garrisoned there. He chose to strain geography, rather than the law, and obtained the opinion of what was apparently a minority-view geographer that Iceland was actually in the Western Hemisphere.

Very recently, Congress has enacted legislation providing that United States forces shall not be dispatched to Laos or Thailand in connection with the Vietnam conflict. This proviso was accepted by the Executive.

This is not to say, however, that every conceivable condition or restriction which Congress may by legislation seek to impose on the use of American military forces would be free of constitutional doubt. Even in the area of domestic affairs, where the relationship between Congress and the President is balanced differently than it is in the field of external affairs, virtually every President since Woodrow Wilson has had occasion to object to certain conditions in authorization legislation as being violative of the separation of powers between the Executive and the Legislative Branch.[3] The problem would be met in exacerbated form should Congress attempt by detailed instructions as to the use of American forces already in the field to supersede the President as Commander in Chief of the armed forces. Surely this is the thrust of Chief Justice Chase's concurring opinion in *Ex parte Milligan*, quoted earlier in this text:

> [Congressional] power necessarily extends to all legislation essential to the prosecution of war with vigor and success, except such as interferes with the command of the forces and conduct of campaigns. That power and duty belong to the President as commander-in-chief.

71 U.S. at 139.

---

[3] All of those Presidents have stated in one way or another that just because Congress concededly may refrain from appropriating any money at all, it does not necessarily follow that it may attach whatever condition it desires to an appropriation which it does make.

Nor is the manner in which armed hostilities may be terminated altogether free from doubt. All declared wars in our history have been customarily concluded by treaties negotiated by the President and ratified by the Senate. An effort in the Constitutional Convention to give Congress the power to declare "peace" as well as "war" was unanimously turned down at the session of August 17, 1787. 3 Madison Notes at 1353.

### VII. The Vietnam Conflict: Relation Between the Power of the President and the Power of Congress

The duration of the Vietnam conflict, and its requirements in terms of both men and materiel, have long since become sufficiently large so as to raise the most serious sort of constitutional question had there been no congressional sanction of that conflict. However, as is well known, the conflict in its present form began following an attack on U.S. naval forces in the Gulf of Tonkin in August 1964. At that time President Johnson took direct air action against the North Vietnamese, and he also requested Congress "to join in affirming the national determination that all such attacks will be met" and asked for "a resolution expressing the support of the Congress for all necessary action to protect our Armed Forces and to assist nations covered by the SEATO [Southeast Asia Treaty Organization] Treaty." H.R. Doc. No. 88-333, at 2 (1964).

On August 10, 1964, Congress passed the following resolution:

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Congress approves and supports the determination of the President, as Commander in Chief, to take all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression.

Sec. 2. The United States regards as vital to its national interest and to world peace the maintenance of international peace and security in southeast Asia. Consonant with the Constitution of the United States and the Charter of the United Nations and in accordance with its obligations under the Southeast Asia Collective Defense Treaty, the United States is, therefore, prepared, as the President determines, to take all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom.

Sec. 3. The resolution shall expire when the President shall determine that the peace and security of the area is reasonably assured by international conditions created by action of the United Nations

> or otherwise, except that it may be terminated earlier by concurrent resolution of the Congress.

Pub. L. No. 88-408, 78 Stat. 384, 384 (1964).

In connection with this resolution, Congress noted that whatever the limits of the President's authority acting alone might be, whenever Congress and the President act together "'there can be no doubt'" of the constitutional authority. H.R. Rep. 88-1708, at 4 (1964) (committee report on Gulf of Tonkin resolution, quoting committee report on Formosa resolution).

Since that time, Congress has repeatedly adopted legislation recognizing the situation in Southeast Asia, providing the funds to carry out United States commitments there, and providing special benefits for troops stationed there. By virtue of these acts, and by virtue of the provision in the Gulf of Tonkin resolution as to the manner in which it may be terminated, there is long-standing congressional recognition of a continuing United States commitment in Southeast Asia.[4]

President Nixon has continued to maintain United States troops in the field in South Vietnam, in pursuance of his policy to seek a negotiated peace which will protect the right of the South Vietnamese people to self-determination. The legality of the maintenance of these troops in South Vietnam, and their use to render assistance to the South Vietnamese troops in repelling aggression from the Viet Cong and the North Vietnamese, would admit of reasonable doubt only if congressional sanction of hostilities commenced on the initiative of the Executive could be manifested solely by a formal declaration of war. But the numerous historical precedents previously cited militate against such a formal type of reasoning.

A requirement that congressional approval of executive action in this field can come only through a declaration of war is not only contrary to historic constitutional usage, but as a practical matter could not help but curtail effective congressional participation in the exercise of the shared war power. If Congress may sanction armed engagement of United States forces only by declaring war, the possibility of its retaining a larger degree of control through a more limited approval is foreclosed. While in terms of men and materiel the Vietnam conflict is one of large scale, the objectives for which the conflict may be carried on, as set forth in the Gulf of Tonkin resolution, are by no means as extensive or all-inclusive as would have resulted from a declaration of war by Congress. Con-

---

[4] "Legislative history" surrounding the Gulf of Tonkin resolution may be cited for a number of varying interpretations of exactly what Congress was authorizing. In view of the very plain text of the resolution, which authorizes the use of military force "as the President determines" to assist Southeast Asian countries, including South Vietnam, in defense of their freedom, Pub. L. No. 88-408, § 2, 78 Stat. at 384, it is all but impossible to argue that substantial military operations in support of the South Vietnamese against North Vietnam and the Viet Cong were not thereby authorized. The fact that Congress did not by adopting this resolution intend to declare war does not detract from this conclusion; the authority conferred by the resolution is a good deal short of that which would be conferred by a declaration of war.

versely, however, there cannot be the slightest doubt from an examination of the language of the Gulf of Tonkin resolution that Congress expressly authorized extensive military involvement by the United States, on no less a scale than that now existing, by virtue of its adoption of this resolution. To reason that if the caption "Declaration of War" had appeared at the top of the resolution, this involvement would be permissible, but that the identical language without such a caption does not give effective congressional sanction to it at all, would be to treat this most nebulous and ill defined of all areas of the law as if it were a problem in common law pleading. Justice Grier, more than a century ago, in the *Prize Cases* said:

> This greatest of civil wars was not gradually developed by popular commotion, tumultuous assemblies, or local unorganized insurrections. However long may have been its previous conception, it nevertheless sprung forth suddenly from the parent brain, a Minerva in the full panoply of *war*. The President was bound to meet it in the shape it presented itself, without waiting for Congress to baptize it with a name; and no name given to it by him or them could change the fact.

67 U.S. at 668–69. If substance prevailed over form in establishing the right of the federal government to fight the Civil War in 1861, substance should equally prevail over form in recognizing congressional sanction for the Vietnam conflict by the Gulf of Tonkin resolution, even though it was not in name or by its terms a formal declaration of war.

Viewed in this context, the President's determination to authorize incursion into the Cambodian border area by United States forces in order to destroy sanctuaries utilized by the enemy is the sort of tactical decision traditionally confided to the Commander in Chief in the conduct of armed conflict. From the time of the drafting of the Constitution it has been clear that the Commander in Chief has authority to take prompt action to protect American lives in situations involving hostilities. Faced with a substantial troop commitment to such hostilities made by the previous Chief Executive, and approved by successive Congresses, President Nixon has an obligation as Commander in Chief of the country's armed forces to take what steps he deems necessary to assure their safety in the field. A decision to cross the Cambodian border, with at least the tacit consent of the Cambodian government, in order to destroy sanctuaries being utilized by North Vietnamese in violation of Cambodia's neutrality, is wholly consistent with that obligation. It is a decision made during the course of an armed conflict as to how that conflict shall be conducted, rather than a determination that some new and previously unauthorized military venture shall be undertaken.

By crossing the Cambodian border to attack sanctuaries used by the enemy, the United States has in no sense gone to "war" with Cambodia. United States forces are fighting with or in support of Cambodian troops, and not against them.

Whatever protest may have been uttered by the Cambodian government was obviously the most perfunctory, formal sort of declaration. The Cambodian incursion has not resulted in a previously uncommitted nation joining the ranks of our enemies, but instead has enabled us to more effectively deter enemy aggression heretofore conducted from the Cambodian sanctuaries.

Only if the constitutional designation of the President as Commander in Chief conferred no substantive authority whatever could it be said that prior congressional authorization for such a tactical decision was required. Since even those authorities least inclined to a broad construction of the executive power concede that the Commander in Chief provision does confer substantive authority over the manner in which hostilities are conducted, the President's decision to invade and destroy the border sanctuaries in Cambodia was authorized under even a narrow reading of his power as Commander in Chief.

WILLIAM H. REHNQUIST
*Assistant Attorney General*
*Office of Legal Counsel*